**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 10, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

B.N.M., (Male Juvenile),

    Defendant - Appellant.

No. 22-7056

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
_____

Howard A. Pincus, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado for Defendant-Appellant.

Benjamin D. Traster, Assistant United States Attorney (Christopher J. Wilson, United States Attorney, with him on the brief), Muskogee, Oklahoma for Plaintiff-Appellee.
_____

Before **HOLMES**, Chief Judge, **McHUGH**, and **EID**, Circuit Judges.
_____

**HOLMES**, Chief Judge.
_____

    B.N.M., a juvenile male, is accused of participating in the murder of his girlfriend's parents when he was fifteen years old. On the government's request, the United States District Court for the Eastern District of Oklahoma transferred B.N.M. to adult status—in other words, it permitted him to be prosecuted as an adult rather

than as a juvenile.  In this interlocutory appeal, B.N.M. challenges this transfer decision.

He first argues that the district court's order was infected with error because the magistrate judge erroneously attributed testimony to B.N.M.'s expert witness when, in fact, the relevant testimony had been given by the government's expert witness.  He further argues that the district court abused its discretion and clearly erred when considering two of the factors relevant to the transfer analysis—*viz.*, the nature of the offense and the availability of programs designed to treat the juvenile's behavioral problems.  Finally, he argues that because the only available punishments for first-degree murder would be unconstitutional when applied to a juvenile, it is unconstitutional to transfer him for adult prosecution.

We reject each of B.N.M.'s arguments and **affirm** the district court's order transferring him for adult prosecution.  First, we begin by providing an overview of the statutory scheme underlying this matter, the Juvenile Justice and Delinquency Prevention Act.  Second, we lay out the factual and procedural history of the case.  Third, we address our own jurisdiction and discuss our standard of review.  Fourth, we individually address each of B.N.M.'s arguments and explain why we are unpersuaded that these arguments require vacatur.

**I**

**A**

The Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. §§ 5031–42, sets forth "special procedures for the prosecution of persons who are juveniles at the time a

federal crime is committed." *United States v. Brian N.*, 900 F.2d 218, 220 (10th Cir. 1990). "Under this act, prosecution results in an adjudication of status—not a criminal conviction." *Id.* The purpose of this special system is "to remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." *Id.* The act defines a "juvenile" as "a person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday." 18 U.S.C. § 5031.

The maximum term of official detention that may be imposed for juvenile delinquency depends on the age of the juvenile and the nature of the offense. For juveniles less than eighteen years old, the term of juvenile detention may not extend "beyond the lesser of": (1) the date they turn twenty-one; (2) the maximum of the range under the U.S. Sentencing Guidelines Manual ("Guidelines" or "U.S.S.G.") "applicable to an otherwise similarly situated adult defendant," unless there is an aggravating factor warranting an upward departure; or (3) the maximum term of imprisonment "if the juvenile had been tried and convicted as an adult." 18 U.S.C. § 5037(c)(1)(A)–(C).[1]

---

[1]    Illustrating how these provisions are applied, at the time of the proceeding before the magistrate judge and the district court, B.N.M. was less than eighteen years old, and it was important to the magistrate judge's weighing of the factors—and thus, by extension to the district court's own weighing—that "if [B.N.M.] is adjudicated a juvenile, he would remain at a juvenile facility until he is twenty-one years old and then be released." R., Vol. I, at 107 (R&R, filed Feb. 22, 2022); *see also* 18 U.S.C. § 5037(c)(1)(A). We offer later some thoughts regarding the district court's reasoning for this determination that B.N.M.'s twenty-first

For juveniles between eighteen and twenty-one years old who are charged with a Class A, B, or C felony, the maximum term of juvenile detention is the lesser of (1) five years, or (2) the maximum of the Guidelines range applicable to a similarly situated adult defendant, unless there is an aggravating factor warranting an upward departure. *See* 18 U.S.C. § 5037(c)(2)(A)(i)–(ii). And for juveniles between eighteen and twenty-one years old who are charged with other felonies, the maximum term of juvenile detention is the lesser of: (1) three years; (2) the maximum of the Guidelines range applicable to a similarly situated adult defendant, unless there is an aggravating factor warranting an upward departure; or (3) the maximum term of imprisonment "if the juvenile had been tried and convicted as an adult." *See* 18 U.S.C. § 5037(c)(2)(B)(i)–(iii).

---

birthday would be the shortest period of detention. *See infra* n.8. Suffice it to note here that, on appeal, the government embraces that statutory conclusion:

> [I]t is unsurprising that the district court found "Defendant's impulsivity and maturity indicate a likelihood that rehabilitation could not be accomplished by the time the Defendant is twenty-one." That time frame is no accident because that would be the maximum time Defendant could have been ordered to official detention had he been adjudicated delinquent at the time the magistrate [judge] issued the Report and Recommendation.

Aplee.'s Resp. Br. at 40–41 (citation omitted). And B.N.M. does not appear to dispute the conclusion here and at least appears to accept the district court's reading of these provisions as a working premise of his arguments on appeal. *Cf.* Aplt.'s Reply Br. at 22–23 ("With the district court never having determined how rehabilitated B.N.M. could be in custody *if his detention on a juvenile adjudication were not capped by his twenty-first birthday*, this case should, at a minimum, be remanded for the district court to consider that issue (and its bearing on the transfer decision) in the first instance." (emphasis added)).

**B**

Under 18 U.S.C. § 5032, juveniles over the age of fifteen may sometimes be transferred for adult prosecution.[2] *See United States v. Leon, D.M.*, 132 F.3d 583, 589 (10th Cir. 1997). But "children are constitutionally different from adults for purposes of sentencing"—in particular, they are "less deserving of the most severe punishments" due to their "diminished culpability and greater prospects for reform." *United States v. Doe*, 58 F.4th 1148, 1156 (10th Cir. 2023) (quoting *Miller v. Alabama*, 567 U.S. 460, 471 (2012)), *cert. denied*, 144 S. Ct. 166 (2023). Consequently, trying a juvenile as an adult is the exception rather than the rule: "[j]uvenile adjudication is presumed appropriate," *United States v. McQuade Q.*, 403 F.3d 717, 719 (10th Cir. 2005), and transfer to adult prosecution is appropriate only "when the government establishes that prosecution as an adult is 'in the interest

---

[2]     The relevant portion of § 5032 provides:

> A juvenile who is alleged to have committed an act of juvenile delinquency and who is not surrendered to State authorities shall be proceeded against under this chapter unless he has requested in writing upon advice of counsel to be proceeded against as an adult, except that, with respect to a juvenile fifteen years and older alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence or [a drug or firearms offense under certain statutes], criminal prosecution on the basis of the alleged act may be begun by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after hearing, such transfer would be in the interest of justice.

18 U.S.C. § 5032. Moreover, although it is not relevant here, transfer for adult prosecution is sometimes mandatory for juveniles over the age of sixteen who commit certain crimes. *See id.*

of justice,'" *Doe*, 58 F.4th at 1156 (quoting *Leon, D.M.*, 132 F.3d at 589). When considering a motion to transfer a juvenile to adult prosecution, the district court must balance the "important interest[s]" represented by the federal juvenile delinquency system "against the need to protect the public from dangerous individuals." *Id.* (quoting *McQuade Q.*, 403 F.3d at 719). "Because a transfer hearing results only in an adjudication of status, the government's burden of proof is merely a preponderance of the evidence." 9B Barbara Van Arsdale, et al., FEDERAL PROCEDURE, LAWYER'S EDITION § 22:2510, Westlaw (updated June 2024) (footnote omitted) (collecting cases).

Title 18 U.S.C. § 5032 sets forth six statutory factors to guide district courts in determining whether a transfer to adult status would be in the "interest of justice." Specifically, these factors are:

> (1) the age and social background of the juvenile;
>
> (2) the nature of the alleged offense;
>
> (3) the extent and nature of the juvenile's prior delinquency record;
>
> (4) the juvenile's present intellectual development and psychological maturity;
>
> (5) the nature of past treatment efforts and the juvenile's response to such efforts; and
>
> (6) the availability of programs designed to treat the juvenile's behavioral problems.

*Doe*, 58 F.4th at 1156–57 (citing 18 U.S.C. § 5032). The government is required to present evidence on each factor. *See United States v. Anthony Y.*, 172 F.3d 1249,

6

1252 (10th Cir. 1999).  And the district court must consider each of these six factors, although it is not required to state whether each specific factor weighs in favor of or against transfer.  *See Leon*, *D.M.*, 132 F.3d at 589.

District courts are given a great deal of discretion in weighing these factors. That is because "[t]he decision to transfer is a grave and often difficult one, and does not lend itself to simple mathematical formulas." *Anthony Y.*, 172 F.3d at 1252. "Rather, the district court must balance the evidence before it, weighing each factor as it sees fit, to determine whether a transfer to adult status best serves 'the interest of justice.'" *Id.* (quoting 18 U.S.C. § 5032).  As a result, the district court "is not required to give equal weight to each factor"; instead, it "'may balance them as it deems appropriate.'" *Leon*, *D.M.*, 132 F.3d at 589 (quoting *United States v. Juvenile Male No. 1*, 47 F.3d 68, 71 (2d Cir. 1995)).  "The court need not even find a majority of factors weigh in favor of the prevailing party[] . . . ." *Anthony Y.*, 172 F.3d at 1252.  But, again, it is important to remember that "[j]uvenile adjudication is 'presumed appropriate'" unless the government demonstrates that the interest of justice warrants prosecuting the juvenile as an adult.  *Doe*, 58 F.4th at 1156 (quoting *United States v. David A.*, 436 F.3d 1201, 1213 (10th Cir. 2006)).

## II

### A

Because the nature of B.N.M.'s crimes is relevant to the transfer analysis (specifically, the second factor), we recount the factual circumstances in detail.  The following facts—which are undisputed for purposes of this appeal—are drawn from

7

the evidence presented at the hearing on the government's motion to transfer B.N.M. for adult prosecution. *See Leon, D.M.*, 132 F.3d at 589–90 ("[I]n making the transfer decision, the court may assume the truth of the government's allegations regarding the defendant's commission of [the] charged crime.").

In December 2020, B.N.M. was fifteen years and four months old. He was in a romantic relationship with A.M., a seventeen-year-old juvenile female.[3] A.M. falsely told B.N.M. that she was pregnant and that because her mother and father did not like B.N.M., the couple could not have a life together with their child as long as her parents were alive. A.M. also told B.N.M. that her parents had mistreated her in the past and that her father had molested her. A.M. asked B.N.M. to kill her parents. B.N.M. doubted that he could kill two grown adults by himself, so he suggested recruiting C.V., A.M.'s eighteen-year-old neighbor, to aid them with the scheme. B.N.M. successfully recruited C.V.

B.N.M., A.M., and C.V. together planned the deaths of A.M.'s parents. They planned to kill A.M.'s mother by hitting her with a baseball bat and using a Taser, and then burying her body. One possible plan that they floated for killing A.M.'s father was to blow up his camper. B.N.M. and A.M. would then escape across state lines.

---

[3] There is a related case against A.M. for her participation in these events. *See Doe*, 58 F.4th at 1152. The government similarly filed a motion to transfer A.M. for adult prosecution. *See id.* We affirmed the district court's transfer of A.M.'s case from juvenile court to adult court in January 2023. *See id.* at 1160. At various points in the record and in *Doe*, A.M. is referred to as "A.M.", "A.N.R.M.", or "Jane Doe." For consistency in this opinion, we use "A.M." whenever we refer to her.

On the night of December 22, 2020, B.N.M. and C.V. put the plan into action. Throughout the evening, A.M. sent text messages to a phone owned by C.V. about her parents' whereabouts and the specifics of the plan.[4]  And in preparation for the crimes, B.N.M. and C.V. dug a large grave for A.M.'s mother and father, although this specific hole was ultimately not used for that purpose.

That night, B.N.M. and C.V. entered A.M.'s family residence[5] through the back.  A.M.'s mother was lying on the couch in the living room, and B.N.M. attempted to tase A.M.'s mother repeatedly while C.V. beat her head with a baseball bat.  The Taser may not have worked, but C.V. also stabbed her in the head and later analysis showed that A.M.'s mother died from multiple blunt force injuries.  B.N.M. and C.V. buried A.M.'s mother in a hole they dug in the backyard.

B.N.M., A.M., and C.V. then cleaned up the murder scene and began to relocate some of A.M.'s belongings to an abandoned house, which was A.M. and B.N.M.'s hideout.  A.M. made a breakfast of eggs and bacon for B.N.M. and C.V.

The next morning, A.M.'s father returned, but the plan to murder him went awry.  When he entered the residence, C.V. shot an arrow at him using a compound

---

[4]    As an example, A.M. texted the phone owned by C.V.: "Kill my mother then take out my father then get what u need take one at a time put into the whole then the next one."  Aplt.'s Suppl. R., Vol. I, at 58 (Record of Text Messages Between A.M. and C.V., filed Sept. 20, 2023).

[5]    As we explained in *Doe*, A.M. lived alone in the family residence. Because her father was not permitted to live with her due to his previous conviction for sexual abuse of A.M.'s half-sister, her parents lived in a camper close to the property, although they regularly spent time in the family residence.  *See Doe*, 58 F.4th at 1153–54.

bow.  The arrow missed, and A.M.'s father and C.V. began fighting over the arrow.

During the struggle, B.N.M. pushed A.M.'s father from behind.  C.V. began to beat

A.M.'s father with a stick (or possibly a bat).  B.N.M. then hit A.M.'s father over the

head with a twenty-five-pound dumbbell, ending the fight.  With A.M.'s father

seemingly dead, and at C.V.'s suggestion, B.N.M. and C.V. attempted to burn the

body and the residence.  They poured gasoline on A.M.'s father and started a fire.

The fire charred only parts of the kitchen; the residence was left mostly intact.  As it

turned out, A.M.'s father was still alive when they set him on fire, and his ultimate

cause of death was burn injuries, along with smoke and soot inhalation.

Afterwards, B.N.M. and C.V. tried to drive off in a car belonging to A.M.'s

father, but B.N.M. flipped the vehicle not far from the residence.  Afterwards,

B.N.M. and A.M. hid in their abandoned house hideout.

Law enforcement responded to a report of the crashed vehicle.  After they

learned that the car belonged to A.M.'s father, they went to the residence and found

the burned body of A.M.'s father, as well as signs of the fire that had charred the

kitchen.  The officers also saw that A.M.'s father had a head wound, and they found

the stick and dumbbell that had been used to beat him.  While the officers

investigated the scene, C.V. kept A.M. and B.N.M. apprised of developments.

Based on information received from an acquaintance of A.M. and a relative of

A.M., law enforcement officers began to search for A.M. and B.N.M.  They also

learned about the possible involvement of C.V. and interviewed him.  Ultimately, the

officers found B.N.M. and A.M. walking down a driveway in a rural area, and, after a

brief foot chase, took A.M. and B.N.M. into custody.  B.N.M. initially gave a false name after he was apprehended.

After law enforcement officers spoke with C.V. and A.M., they interviewed B.N.M. in the company of his mother.  For the first part of the interview, B.N.M. maintained that C.V. alone had committed the murders, but his story changed as it became clear that it was inconsistent with the information already possessed by law enforcement.  For example, B.N.M. initially said that C.V. had hit A.M.'s father with the dumbbell, but later admitted that he had done so.  The early stages of B.N.M.'s interview contained a number of additional statements that B.N.M. later acknowledged to be fabrications, including that C.V. had come up with the idea for the murders and, separately, that he had no idea who C.V. was.[6]

**B**

**1**

On April 21, 2021, B.N.M. was charged by juvenile information with murdering an Indian—A.M.'s father, who was a member of the Choctaw Nation—in Indian Country, in violation of 18 U.S.C. §§ 1111(a), 1151, and 1152.  Additionally, as required under 18 U.S.C. § 5032, the government filed a certification to proceed

---

[6] During the very early stages of the interview, B.N.M.'s conversation with his mother was recorded even though law enforcement had stated that they could speak privately.  During this conversation, B.N.M. tried to paint C.V. as solely responsible and told a fabricated story of stumbling upon the body of A.M.'s father after he was already dead.  The government sought to elicit testimony on this portion of the interview at the hearing on the motion to transfer, and B.N.M. objected.  The district court ultimately permitted the testimony for purposes of the motion to transfer, and B.N.M. does not challenge that decision on appeal.

under the Juvenile Justice and Delinquency Prevention Act.  B.N.M. was not federally charged with the murder of A.M.'s mother.

On the same day, the government filed a motion to transfer B.N.M. for adult criminal prosecution.  According to the government, B.N.M.'s actions "were committed after [his] fifteenth birthday and if committed by an adult would be a violent felony."  R., Vol. I, at 18 (Mot. to Transfer, filed Apr. 21, 2021).  Additionally, the government asserted that "[i]t would be in the interest of justice if the district court would transfer the juvenile for criminal prosecution as an adult for the alleged criminal act."  *Id.* at 18–19.

The district court referred the motion to transfer to a United States magistrate judge.  The magistrate judge scheduled a hearing on the motion to transfer, but, at B.N.M.'s request, the magistrate judge continued the hearing so that B.N.M. could seek a psychological evaluation.  Separately, the magistrate judge granted, over B.N.M.'s objection, a motion by the government to have B.N.M. psychologically evaluated by its own forensic psychologist.  It found that such an evaluation would "assist the [District] Court in making findings regarding the juvenile's present intellectual development and psychological maturity, the nature of past treatment efforts and the juvenile's response to such efforts, and the availability of programs designed to treat the juvenile's behavior problems."  R., Vol. I, at 36 (Order Granting Mot. for Psych. Evaluation, filed Aug. 4, 2021).[7]

---

[7]     B.N.M. appealed the magistrate judge's order, and the district court denied his appeal.

12

**2**

The magistrate judge held a hearing on the motion to transfer on January 12, 2022.  At the hearing, several witnesses testified.  First, an agent from the Oklahoma State Bureau of Investigation testified about the law enforcement investigation into the murders, the arrests of the suspects involved, and the interview of B.N.M.

Next, Dr. Jarrod Steffan, the forensic psychologist who performed an examination of B.N.M. at the government's request, testified.  After being recognized as an expert in forensic psychology, Dr. Steffan testified about a variety of subjects, including: (1) the psychological development of fifteen-year-olds; (2) B.N.M.'s previous juvenile delinquency, which was minimal but showed some indicia of antisocial behavior; (3) B.N.M.'s psychological maturity and intellectual development; (4) the nature of the crime, which appeared to be sophisticated and well-planned; and (5) the overall lack of remorse or empathy exhibited by B.N.M.

Several aspects of Dr. Steffan's testimony require a more thorough discussion.  In particular, Dr. Steffan testified that, in his opinion, treating B.N.M. would require intensive, long-term rehabilitation, including therapy, psychotropic medication, substance abuse treatment, and skills training.  Overall, Dr. Steffan testified that B.N.M. had a "guarded prognosis for treatment, not the worst but below average"— in other words, "[s]o there's some possibilities, but it's not overly strong."  R., Vol. II, at 162 (Tr. Mot. Transfer Hr'g, dated Jan. 12, 2022).  Dr. Steffan also testified that in order for B.N.M. to succeed out of custody, B.N.M. would need some type of placement that continuously monitored him, with intensive supervision,

comprehensive mental health services, medication, individual therapy, and therapy to strengthen family ties.  He further testified that some of those options might be available in the community, but that B.N.M. would not receive the family support that he needed.  Indeed, Dr. Steffan repeatedly emphasized that treatment and rehabilitation would require strong family support, but that B.N.M. did not have a stable home environment and would not receive the support he would need for non-custodial treatment to succeed.

Dr. Steffan's report was also introduced into evidence.  The report noted that B.N.M. had an "average degree of risk for future offending."  R., Vol. I, at 154 (Report of Dr. Jarrod Steffan, filed Oct. 24, 2022).  It also noted that his amenability to treatment was "average" compared to other juvenile offenders.  *Id.* at 155.  The report further stated that B.N.M. "will require intensive, long-term rehabilitation services, including psychotropic medication, psychotherapy, and widespread skills training."  *Id.* at 156.

Next, Karl Leukefeld, an employee of the Federal Bureau of Prisons, testified. Mr. Leukefeld testified about the federal facilities that contain juvenile offenders and the education and counseling services available at those facilities.  He also described the process for transitioning juvenile offenders to adult prisons, and the programs available for young offenders at adult prisons.  He explained that although there were better staffing ratios and more individual therapy available in juvenile facilities, the adult facilities had programs such as the BRAVE program, which provides aid to younger inmates in adult facilities, and the Skills Program, which deals with

14

intellectual deficits. He stated that adult facilities in fact offered more programs than the juvenile facilities—albeit in "a modified therapeutic community setting" involving other inmates. R., Vol. II, at 223.

The final witness to testify was Dr. Curtis Grundy, the psychologist who examined B.N.M. at his request, and whom the magistrate judge considered an expert on psychology, forensic psychology, and intellectual disabilities. Dr. Grundy testified in detail about the various examinations he performed on B.N.M. and about his conclusion that B.N.M. had an intellectual disability as well as "very delayed" intellectual development. *Id.* at 268. Among other things, Dr. Grundy testified that he rated B.N.M. as having a "moderate risk" for future aggression and that he would "need[] intervention and treatment, which would be anger management, character development, substance abuse, individual and trauma-focused therapy and then life skills due to intellectual disability." *Id.* at 262.

Dr. Grundy testified that he was quite impressed about what he heard from Mr. Leukefeld about the options available at federal juvenile facilities and that B.N.M. could receive the treatment he needs at such facilities. Dr. Grundy also testified about B.N.M.'s reactions to the murders and his descriptions of them. Dr. Grundy's report, which was entered in evidence, also provided that B.N.M. "would benefit from interventions commonly provided to juvenile offenders," including medication, the resumption of special education services, individual and group therapy, and substance abuse treatment. R., Vol. I, at 170 (Report of Dr. Curtis Grundy, filed Oct. 24, 2022).

15

**3**

The magistrate judge issued an R&R on February 22, 2022, recommending that the district court grant the motion to transfer. In making that recommendation, the magistrate judge considered the six transfer factors laid out by 18 U.S.C. § 5032: (1) "the age and social background of the juvenile;" (2) the nature of the offense; (3) the juvenile's previous delinquency record; (4) the juvenile's intellectual development and maturity; (5) the existence of and response to past treatment programs; and (6) "the availability of programs designed to treat the juvenile's behavior problems." R., Vol. I, at 88 (R&R, filed Feb. 22, 2022) (quoting 18 U.S.C. § 5032).

The magistrate judge found that the first, third, fourth, and fifth factors were either neutral or weighed against transfer. He determined that the two remaining factors—the nature of the alleged offense (the second factor) and the availability of programs designed to treat the juvenile's behavioral problems (the sixth factor)— weighed in favor of transfer. Important to the magistrate judge's weighing of the factors was the judge's conclusion that "if [B.N.M.] is adjudicated a juvenile, he would remain at a juvenile facility until he is twenty-one years old and then be released." *Id.* at 107; *see also* 18 U.S.C. § 5037(c)(1)(A).[8]

---

[8]    As discussed above, the maximum term of detention for a juvenile under the age of eighteen cannot extend beyond the lesser of: (1) the date the juvenile turns twenty-one; (2) the applicable Guidelines range for an adult defendant; or (3) the statutory maximum term of imprisonment for an adult defendant. *See* 18 U.S.C. § 5037(c)(1)(A)–(C). Here, although the magistrate judge did not articulate why he found that the first option would result in the shortest period of detention, the

With respect to the nature of the offense, the magistrate judge afforded "this factor the most weight in the calculus of factors" because "'"serious, violent crimes" can weigh heavily in favor of transfer.'" R., Vol. I, at 94 (quoting *United States v. J.J.P.*, 434 F. Supp. 3d 372, 378 (D. Md. 2020)). The magistrate judge described the gruesome and pre-planned nature of the offense. He then found that, despite the actions taken by B.N.M., "there is strong evidence to indicate here that [B.N.M.'s] actions were more closely associated with that of a follower than a leader." *Id.* at 97. But he concluded that "[n]evertheless, . . . the double homicide in this case, along with the level of preparation, planning, and follow-through involved over several days, indicates it is among the most severe types of crimes and that it weighs heavily in favor of transfer."[9] *Id.*

With respect to the availability of programs to treat B.N.M.'s behavioral problems, the magistrate judge noted that if B.N.M. was adjudicated a juvenile, he would remain in custody at a juvenile facility until he was twenty-one, and if B.N.M. was transferred to adult status, he would remain in a juvenile facility until he was eighteen, and then be transferred to an adult prison. After discussing Mr. Leukefeld's

---

reasoning is easy to fathom: B.N.M. is charged with first-degree murder, and both the first-degree murder statute and the Guidelines provide long periods of incarceration for individuals found guilty of that crime. *See* 18 U.S.C. § 1111(b); U.S.S.G. § 2A1.1 (U.S. Sentencing Comm'n 2021).

[9]    B.N.M. concedes that his conduct in the murder of A.M.'s mother may be considered even though he was not federally charged with her murder.

testimony regarding the availability of programs at both juvenile and adult facilities, the magistrate judge stated:

> Dr. Grundy expressed that he was impressed with the availability of programs offered for juveniles by the BOP, as well as the staffing ratios. *He further testified that treatment and rehabilitation would often require strong family support, and that a return to an unstable family environment could result in adverse outcomes including treatment failures, non-compliance, absconding, and recidivism. He opined that the Defendant would have a guarded prognosis for treatment.* Furthermore, there is no evidence from the Transfer Hearing that there would be any sort of programs *or* substantive family support available to the Defendant if he were to be released at the age of twenty-one.

*Id.* at 109 (first emphasis added). As will be explained, the second and third sentences of this excerpt (which are italicized to highlight them) actually reflect the opinions of Dr. Steffan (i.e., the prosecution's expert)—not Dr. Grundy (i.e., B.N.M.'s expert).

Ultimately, the magistrate judge concluded that "there is a low likelihood of sufficient treatment or rehabilitation for the Defendant, particularly given his delayed abilities, before he reaches the age of 21." *Id.* at 110. The magistrate judge continued that he "ha[d] further considered the lack of rehabilitative programs available to the Defendant should he be released into the community at the age of twenty-one in contrast with the availability of programs within the BOP while he is a juvenile *and* should he be transferred as an adult." *Id.* Ultimately, the magistrate judge found that this factor weighed in favor of transfer.

Balancing all six of the factors, the magistrate judge concluded that transfer to adult status was warranted, writing:

18

> Although some factors favor a denial of the transfer motion or are neutral, the undersigned Magistrate Judge finds that in light of the gross severity of the crime, along with the low potential for rehabilitation to be accomplished by the time the Defendant reaches age twenty-one, the Government has met its burden of establishing that transfer to adult status is warranted in the interests of justice, and that the "risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system outweighs the defendant's chance for rehabilitation."

*Id.* (quoting *United States v. T.F.F.*, 55 F.3d 1118, 1121 (6th Cir. 1995)). He thus recommended that the motion to transfer be granted.

**4**

B.N.M. objected to the magistrate judge's R&R, raising several arguments. We highlight ones that are salient in our analysis. *First*, B.N.M. raised a number of arguments regarding the magistrate judge's analysis of the § 5032 transfer factors. Regarding the second factor, B.N.M. argues that the district court erred by essentially relying *only* on the nature of the offense and, relatedly, by failing to account for B.N.M.'s role as a follower. *See* R., Vol. I, at 119 (Obj. to R&R, filed Mar. 8, 2022) ("The court has given the most weight to [the second] of the six factors. Although the court may determine what weight to give the various factors it should not discount all but the nature of the alleged offense. This is inappropriate. Any homicide can be described as serious or violent. That in itself should not be the only consideration for transfer."); *id.* at 120 ("It is clear in the facts that A.M. was the planner and director and that [C.V.] carried out the orders. B.N.M. although there and present during everything was a follower of directions and had no means to carry out this crime by himself. This factor should weigh against transfer.").

19

On the sixth factor—the availability of programs designed to treat the juvenile's behavioral problems—he argued that the magistrate judge discounted the possibility of court-imposed juvenile delinquent supervision. But he did not include an argument that the magistrate judge had improperly commingled the testimony of Dr. Grundy and Dr. Steffan.

*Second*, he argued that the magistrate judge erred in recommending transfer because, in light of the fact that the available sentences for adults convicted of first-degree murder are life without parole or death, it would be unconstitutional to make him—a juvenile—face such punishments.

On October 13, 2022, the district court affirmed and adopted the magistrate judge's R&R. *See* R., Vol. I, at 134 (Dist. Ct. Order on Mot. to Transfer, filed Oct. 13, 2022). The district court rejected the balance of B.N.M.'s objections concerning the six factors. With respect to the second factor—the nature of the alleged offense—the district court rejected B.N.M.'s argument that it was the only factor the magistrate judge truly considered, and the district court noted that although B.N.M.'s actions "were more closely associated with that of a follower than a leader," the nature of the double homicide in this case weighed heavily in favor of transfer. *Id.* at 132. With respect to the sixth factor, the district court noted only that "[e]ven considering that the period of [juvenile] detention may be followed by a period of juvenile delinquent supervision," it "agree[d] with the R&R's well-reasoned findings." *Id.* at 133. The district court also concluded that B.N.M.'s

20

constitutional argument was not yet ripe.  It thus ordered B.N.M.'s transfer to adult criminal prosecution.

B.N.M. timely appealed.

## III

### A

We pause briefly to ensure that our appellate jurisdiction is proper.  *See United States v. De Vaughn*, 694 F.3d 1141, 1145 (10th Cir. 2012) (observing that "we have an independent duty to examine our own jurisdiction" (quoting *Amazon, Inc. v. Dirt Camp, Inc.*, 273 F.3d 1271, 1274 (10th Cir. 2001))).

The order transferring B.N.M. for adult prosecution is an interlocutory order.  *See Leon, D.M.*, 132 F.3d at 587.  Ordinarily, we would lack jurisdiction over such an order until the district court enters a final judgment.  *See id.*  Nevertheless, under the collateral order doctrine, we can properly exercise jurisdiction over the order transferring B.N.M. for adult prosecution.  *See Doe*, 58 F.4th at 1153 (concluding that we had jurisdiction under the collateral order doctrine over an appeal challenging the district court's transfer of a juvenile for prosecution as an adult); *United States v. Angelo D.*, 88 F.3d 856, 857–59 (10th Cir. 1996) (same); *see also Leon, D.M.*, 132 F.3d at 588–89 (concluding that we had jurisdiction under the collateral order doctrine over an appeal from an order *denying* a request to transfer a juvenile for criminal prosecution).

### B

Given the amount of latitude afforded to district courts in weighing the six transfer factors, it is no surprise that "[w]e review a district court's decision

21

regarding a juvenile transfer motion for an abuse of discretion." *Doe*, 58 F.4th at 1156. "A district court abuses its discretion in deciding whether to transfer a juvenile to adult status when it fails to make the required factual findings or when its factual findings are clearly erroneous." *McQuade Q.*, 403 F.3d at 719 (quoting *Leon, D.M.*, 132 F.3d at 590). "But the possibility an appellate court 'might have reached a different conclusion had it considered the matter in the first instance' is insufficient to overrule the district court's transfer order." *Doe*, 58 F.4th at 1159 (quoting *McQuade Q.*, 403 F.3d at 719). Our review of transfer decisions is "highly deferential" and "[t]he defendant bears a 'heavy burden' in seeking to overturn the district court's decision." *McQuade Q.*, 403 F.3d at 719 (quoting *Leon, D.M.*, 132 F.3d at 590). Nevertheless, we recognize that a district court may abuse its discretion where it "commits legal error," *United States v. A.S.*, 939 F.3d 1063, 1082 (10th Cir. 2019) (quoting *Dullmaier v. Xanterra Parks & Resorts*, 883 F.3d 1278, 1295 (10th Cir. 2018)), and legal questions are reviewed de novo, *see, e.g.*, *Doe*, 58 F.4th at 1156 ("We review statutory interpretation and legal standards de novo.").

## IV

B.N.M. raises three arguments on appeal. First, he argues that the district court erred in accepting the magistrate judge's R&R because the R&R wrongly attributed statements about B.N.M.'s prognosis and treatment to B.N.M.'s expert witness when those statements had actually been made by the government's expert witness. Second, B.N.M. argues that the district court committed clear error and thus abused its discretion in its consideration of the second and sixth transfer factors. Third, he argues that it is

22

unconstitutional to transfer him for adult prosecution.  We address each argument in turn and reject them.

**A**

B.N.M. first argues that one of the primary justifications for the district court's transfer of B.N.M.—*viz.*, its finding that B.N.M. had a low likelihood of being rehabilitated by the time he turned twenty-one and would have to be released from juvenile detention—was "infected with a clear factual error," and that by making such an error, "the district court abused its discretion."  Aplt.'s Opening Br. at 23. Specifically, B.N.M. observes that in the discussion of the sixth transfer factor (the availability of programs that could treat the juvenile's behavioral problems), the magistrate judge relied on testimony that he misattributed to B.N.M.'s expert, Dr. Grundy, when the testimony had actually been given by the government's expert, Dr. Steffan.

As B.N.M. notes, the magistrate judge recounted the testimony of Dr. Grundy, who—according to the magistrate judge—testified that: (1) he was impressed by the programs available at juvenile facilities; (2) "treatment and rehabilitation would often require family support," which was lacking in this case and thus there could be adverse outcomes; and (3) he believed that B.N.M. had a "guarded prognosis for treatment." *Id.* at 24 (quoting R., Vol. I, at 109).  The magistrate judge mentioned this testimony in concluding that there was a low likelihood of rehabilitation before B.N.M.'s twenty-first birthday, which is when he would have to be released from juvenile detention if he was not transferred for adult prosecution.

23

But according to B.N.M., the magistrate judge made an erroneous factual finding that the district court adopted.  B.N.M. accurately points out that the last two statements above actually were conveyed by Dr. Steffan—the expert retained by the government—in his testimony, and not Dr. Grundy.  Specifically, it was Dr. Steffan who had testified about the importance of family support and that he believed B.N.M. had a "guarded prognosis" for treatment.  *Id.* at 25.  In other words, B.N.M. contends that the magistrate judge misattributed Dr. Steffan's testimony to Dr. Grundy and asserts that this attribution error provides a basis for vacating the transfer order.

We disagree that this attribution error provides a basis for vacating the transfer order.  Because B.N.M. did not raise this issue in his objection to the magistrate judge's R&R, the firm-waiver rule applies.  The parties agree that, under this rule, we will reach B.N.M.'s argument only if he can show that the district court plainly erred in accepting the magistrate judge's R&R.  B.N.M. has not made the necessary showings to succeed under this exacting, plain-error standard because, even assuming that he has shown a "plain" (i.e., clear or obvious) factual error, he has not shown that the error affected his substantial rights.

**1**

"This circuit has 'adopted a firm waiver rule when a party fails to object to the findings and recommendations of the magistrate [judge].'"  *Casanova v. Ulibarri*, 595 F.3d 1120, 1123 (10th Cir. 2010) (alteration in original) (quoting *Wirsching v. Colorado*, 360 F.3d 1191, 1197 (10th Cir. 2004)).  Under this rule, "[t]he failure to timely object to a magistrate's recommendations 'waives appellate review of both

factual and legal questions.'"  *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).

Moreover, "only an objection that is sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute" is sufficient. *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Thus, the firm-waiver doctrine extends to specific issues that were not raised in objections to a magistrate judge's report and recommendation.  *See Quint v. Vail Resorts, Inc.*, 89 F.4th 803, 814 (10th Cir. 2023) ("[The plaintiffs] did not raise this issue in their objections to the R&R.  They therefore waived appellate review of this argument." (citation omitted)); *Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006) ("[B]ecause [the plaintiff] failed to raise these issues in the objections that he filed to the magistrate judge's recommended disposition, the issues are waived.  Accordingly, we do not need to consider them."); *see also Macklin v. Dowling*, 822 F. App'x 720, 724 (10th Cir. 2020) (concluding that a litigant had waived an argument that he was entitled to an evidentiary hearing before the magistrate judge by failing to raise that argument in any detail in his objection). [10]

Like many rules in the law, our firm-waiver rule is not without exception.  One such exception [11] is that we will overlook a litigant's failure to object to a magistrate

---

[10]     We cite unpublished cases for their persuasive value only and do not treat them as binding authority.  *See United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022).

[11]     To be sure, there are other exceptions to our application of the firm-waiver rule.  As we have explained, "[t]his rule does not apply . . . when (1) a *pro se*

judge's report and recommendation if the litigant can show, as to the issue sought to be contested, that the district court plainly erred by accepting the magistrate judge's report and recommendation. *See Johnson v. Reyna*, 57 F.4th 769, 778 & n.7 (10th Cir. 2023); *Wardell v. Duncan*, 470 F.3d 954, 958 (10th Cir. 2006). Put differently, our firm-waiver rule "may be suspended . . . when the aggrieved party makes the onerous showing required to demonstrate plain error."[12] *Wardell*, 470 F.3d at 958. But if a litigant fails to make this showing, the firm-waiver rule ordinarily bars our consideration of the waived issue.

---

litigant has not been informed of the time period for objecting and the consequences of failing to object, or when (2) the 'interests of justice' require review." *Morales-Fernandez v. INS*, 418 F.3d 1116, 1119 (10th Cir. 2005) (quoting *Moore*, 950 F.2d at 659). B.N.M. does not argue that either of these exceptions applies here, and we accordingly do not discuss them.

[12]      Admittedly, we have not always been consistent as to whether plain error is an independent exception to our firm-waiver rule or whether it forms part of the well-established "interests of justice" exception to that rule. *Compare Wardell*, 470 F.3d at 958 (suggesting that plain error is an independent exception to application of our firm-waiver rule), *and Martinez v. Martinez*, 294 F. App'x 410, 413 (10th Cir. 2008) (same), *with Morales-Fernandez*, 418 F.3d at 1120 (suggesting that plain error is sufficient to invoke the interests-of-justice exception to the application of our firm-waiver rule), *and Craighead v. Bear*, 717 F. App'x 815, 819 (10th Cir. 2017) (same); *see also United States v. Burbage*, 280 F. App'x 777, 780 n.3 (10th Cir. 2008) (describing these two different lines of case law). Here, the parties agree that to suspend application of the firm-waiver rule, B.N.M. must demonstrate plain error. In light of this agreement, it is unnecessary for us to resolve this tension in our case law because, although this distinction could conceivably matter in some cases, it does not matter here. *See Burbage*, 280 F. App'x at 780 n.3 ("We need not endeavor, however, to determine whether these . . . cases in fact contemplate different roles for plain error review in the assessment of whether to suspend the firm waiver rule. . . . [The petitioner] did not make any germane allegations of plain error. Therefore, no plain error analysis is appropriate.").

Here, as B.N.M. concedes, although he did object to the magistrate judge's

R&R, he did not raise in that objection any argument that the magistrate judge

committed an attribution error.  Because of his failure to bring this issue to the

attention of the district court in his objection, he has waived the issue.  *See Quint*,

89 F.4th at 814; *Barnhart*, 444 F.3d at 1208.  And as B.N.M. further concedes, we

will overlook his failure to object on this ground only if he shows that the district

court committed plain error in accepting the magistrate judge's R&R.[13]

**2**

"A party seeking relief under the plain-error rubric bears the burden of

showing '(1) an error, (2) that is plain, which means clear or obvious under current

law, and (3) that affects substantial rights.'"  *United States v. Finnesy*, 953 F.3d 675,

684 (10th Cir. 2020) (quoting *United States v. McGehee*, 672 F.3d 860, 876

---

[13]     At times, we have framed the inquiry as whether the *magistrate judge* plainly erred.  *See Wardell*, 470 F.3d at 958 n.2 ("It was certainly not plain error for the magistrate judge to disregard due process interests of non-parties[] . . . ."); *Duffield*, 545 F.3d at 1239 ("We cannot say that the magistrate judge committed plain error . . . .").  But, in light of the obvious fact that the district court is the final decision-maker, and it is that court's order that constitutes the appealable order, the more precise articulation of the standard is whether the *district court* plainly erred in *accepting* the magistrate judge's report and recommendation.  *See Morales-Fernandez*, 418 F.3d at 1124 (framing the inquiry as whether "the district court" committed plain error that affected the petitioner's substantial rights); *see also Hodson v. Reams*, 823 F. App'x 659, 662 (10th Cir. 2020) ("[W]e do not think the district court committed plain error."); *United States v. Arroyo-Gonzales*, 316 F. App'x 761, 764 (10th Cir. 2009) ("[T]he district court did not commit plain error in adopting the magistrate judge's recommendation . . . ."); *Burbage*, 280 F. App'x at 781 ("[W]e need not conduct a plain error analysis because [the petitioner] does not point to any error in the magistrate judge's recommendations that the district court could be deemed to have plainly erred in adopting.").

(10th Cir. 2012)). "If these factors are met, [this court] may exercise discretion to correct the error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (alteration in original) (quoting *United States v. Cordery*, 656 F.3d 1103, 1105 (10th Cir. 2011)). "Satisfying all four prongs of the plain-error test is difficult." *United States v. Benally*, 19 F.4th 1250, 1256 (10th Cir. 2021) (quoting *Greer v. United States*, 593 U.S. 503, 508 (2021)).

B.N.M. has not made the necessary showings to satisfy this rigorous standard. Even assuming that B.N.M. has shown that the attribution error was "plain" (i.e., clear or obvious)—which we do not decide—he has not met his burden under the third prong to show that the error affected his substantial rights.

Ordinarily, for an error to affect substantial rights (or, in other words, to be prejudicial), "the error must have affected the outcome of the district court proceedings." *Finnesy*, 953 F.3d at 684 (quoting *United States v. Garcia*, 946 F.3d 1191, 1202 (10th Cir. 2020)); *see also United States v. Starks*, 34 F.4th 1142, 1157 (10th Cir. 2022) ("To demonstrate under the third prong of the plain-error test that an error affected a defendant's substantial rights, 'a defendant generally must demonstrate that an error was "prejudicial, meaning that there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different."'" (quoting *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1138 (10th Cir. 2017) (en banc))). But this prong does not require a defendant to "prove by a preponderance of the evidence that but for error things would have been different"—instead, the defendant must show that the claimed error is "sufficient to

28

undermine confidence in the outcome." *Starks*, 34 F.4th at 1157 (first quoting

*Bustamante-Conchas*, 850 F.3d at 1138; then quoting *United States v. Hasan*,

526 F.3d 653, 665 (10th Cir. 2008)).

Under this standard, B.N.M.'s challenge fails. He has not shown that there is a

reasonable probability that the attribution error affected the conclusion that there was

a low likelihood that he would be sufficiently rehabilitated before he would have to

be released from juvenile detention. And, by extension, he has not shown that there

is a reasonable probability that the error affected the ultimate decision to transfer him

for adult prosecution.

That is because the attribution error must be read in context: during a multiple-

page discussion of the sixth transfer factor (the availability of programs to treat

B.N.M.'s behavioral problems), the district court in only a couple of sentences

erroneously attributed testimony to Dr. Grundy that had actually been given by Dr.

Steffan. But most of the circumstances that the magistrate judge relied on in support

of the finding of a low likelihood of rehabilitation—including the comparative

availability of programs in juvenile and adult facilities (which Mr. Leukefeld spoke

to at length), B.N.M.'s delayed abilities, and B.N.M.'s lack of family support[14]—are

---

[14]    In the discussion of the first transfer factor—the age and background of the juvenile—the magistrate judge made findings about B.N.M.'s tumultuous family history. B.N.M. challenged these findings in his objection to the R&R, and the district court concluded that the additional evidence pointed to by B.N.M. did not alter the outcome. B.N.M. does not challenge any of the factual findings regarding his family support on appeal. Nor could he, given the amount of record evidence supporting the findings that his family structure was indeed rocky and that his family could not provide the support he would need.

undoubtedly supported by ample record evidence and uncontested on appeal.

Notably, it bears emphasizing that only two sentences are misattributed within this

several-page analysis.  And even then, the misattributed testimony had, in fact, been

given by an expert witness at the hearing, which is the kind of testimony that the

magistrate judge would have been justified in relying on; the expert testimony had

just been given by Dr. Steffan rather than Dr. Grundy.  It is therefore hard to see how

this simple attribution error could have affected the conclusion on the sixth factor.

*See King v. Dep't of Veterans Affs.*, 225 F. App'x 875, 877 (Fed. Cir. 2007) (per

curiam) (concluding that an administrative judge did not abuse his discretion when he

misattributed testimony from one employee to another because "[t]he attribution of

the statement to a particular VA employee was not important to the [administrative

judge's] holding"); *United States v. Jackson*, No. 22-2225, 2023 WL 4079996, at *3

(7th Cir. June 20, 2023) (unpublished) (concluding that a misattribution error was

harmless because the panel saw "no real probability that the district court would

discredit [a witness's] report if asked to distinguish more neatly" between the two

witnesses, and because "the evidence firmly supported" the minimum sentence

imposed); *Sievers v. Berryhill*, 734 F. App'x 467, 470–71 (9th Cir. 2018) (concluding

that a misattribution error was harmless when the same credibility issues that applied

to the misattributed witness applied to the witness who actually prepared the

document, so the error was unlikely to affect the decision).

B.N.M.'s argument that the attribution error affected the transfer decision is

based on pure speculation.  To be sure, a misattribution error conceivably could,

under certain circumstances, be prejudicial.  For example, if the identity of the witness who provided certain testimony was important to the district court's decision, that could support a conclusion that a misattribution error was prejudicial.  But even though he bears the burden of showing prejudice, B.N.M. points to nothing in the record indicating that the identity of the expert witness was important to the decision.  To the contrary, it is a reasonable inference from the magistrate judge's R&R that it was the *substance* of the testimony—specifically, that *an* expert testified that B.N.M. had a guarded prognosis and that treatment and rehabilitation would require strong family support—that drove the magistrate judge's analysis, not the *identity* of the testifying witness.  We are thus left to speculate what—if any—effect the attribution error had on the magistrate judge's recommendation and the district court's transfer decision.

Because B.N.M. has failed to move the needle beyond the realm of speculation or undermine our confidence in the outcome, he has not carried his burden to show that the attribution error affected his substantial rights.  *See Jones v. United States*, 527 U.S. 373, 394–95 (1999) ("Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights."); *United States v. Vannortwick*, 74 F.4th 1278, 1284 (10th Cir. 2023) (concluding that a defendant had failed to show an effect on his substantial rights when we could only speculate as to how the district court's purported error affected its ultimate decision); *see also United States v. Richardson*, 597 F. App'x 512, 517 (10th Cir. 2015) ("[A]ny claim of prejudice in this regard is purely

31

speculative and insufficient to satisfy the third prong of plain error review."); *United States v. Navarro-Flores*, 421 F. App'x 863, 866 (10th Cir. 2011) ("[The defendant's] demonstration of impact to his substantial rights thus rests entirely upon speculation.  Such speculation cannot satisfy the substantial rights prong of plain error review.").

This conclusion is bolstered by the ample evidence in the record supporting the district court's transfer decision.  As discussed below, the magistrate judge appropriately gave the nature of the offense (the second transfer factor) the most weight and concluded that it weighed heavily in favor of transfer.  Given how much weight the magistrate judge and the district court gave to that factor—and in light of the heinous and pre-planned nature of the offense—it is particularly doubtful that an isolated attribution error during the discussion of the sixth transfer factor affected the ultimate transfer decision.  *See United States v. Bilbo*, 19 F.3d 912, 916–17 (5th Cir. 1994) (concluding that any error committed by the district court in looking to a specific incident at the motion-to-transfer stage did not affect the defendant's substantial rights because "[e]ven without considering the . . . incident, the district court would have determined that this factor supported transfer and would have transferred [the defendant]"); *cf. United States v. Ibarra-Diaz*, 805 F.3d 908, 926–27 (10th Cir. 2015) (concluding that an error in the admission of a statement did not affect the defendant's substantial rights because there was overwhelming evidence of the defendant's guilt); *United States v. Battles*, 745 F.3d 436, 453 (10th Cir. 2014) (same).

B.N.M.'s arguments to the contrary are unavailing.[15]  First, he argues that the district court's attribution error indicates that it did not grapple with the substance of Dr. Grundy's testimony and that, "[h]ad the district court considered Dr. Grundy's actual position, there is at least a reasonable probability it would have made a favorable determination on the rehabilitation issue, and denied transfer."  Aplt.'s Reply Br. at 9–10.  But it is pure speculation that the magistrate judge—and by necessary extension, the district court—failed to consider the substance of Dr. Grundy's testimony and, importantly, how his testimony differed from Dr. Steffan's. The evidence given by the dueling experts was before the magistrate judge.  And, in a separate portion of the R&R, the magistrate judge laid out much of the conflicting evidence given by Dr. Grundy and Dr. Steffan.  In that section, the magistrate judge accurately observed that it was Dr. Steffan who stated that B.N.M. had a "guarded prognosis" for rehabilitation and that Dr. Steffan testified that B.N.M. would need "family therapy" if he were not incarcerated.  R., Vol. I, at 102–03.  The fact that the magistrate judge accurately summarized much of the testimony of Dr. Steffan and Dr. Grundy in this separate context undercuts B.N.M.'s argument that the magistrate judge did not realize that the experts gave conflicting testimony.

---

[15]     B.N.M. also points to a perceived conflict within Dr. Steffan's testimony: that Dr. Steffan testified both that (1) B.N.M. had average treatment amenability, and (2) B.N.M. had a guarded prognosis for successful treatment.  We see nothing contradictory about these two statements and decline to discuss the issue further.

Second, B.N.M. asserts that the placement of the misattributed testimony within the R&R supports his argument that the error was prejudicial. The portion of the R&R at issue reads:

> Dr. Grundy expressed that he was impressed with the availability of programs offered for juveniles by the BOP, as well as the staffing ratios. He further testified that treatment and rehabilitation would often require strong family support, and that a return to an unstable family environment could result in adverse outcomes including treatment failures, non-compliance, absconding, and recidivism. He opined that the Defendant would have a guarded prognosis for treatment. Furthermore, there is no evidence from the Transfer Hearing that there would be any sort of programs *or* substantive family support available to the Defendant if he were to be released at the age of twenty-one.

*Id.* at 109. As we have discussed, only the second and third sentences of this paragraph are contended to be erroneously attributed. According to B.N.M., it is significant that the misattribution occurred immediately after the accurate recitation of Dr. Grundy's testimony that he was impressed by the juvenile programs at the Bureau of Prisons. B.N.M. asserts that the testimony about the Bureau of Prisons programs could not have possibly been given by Dr. Steffan (who had testified prior to Mr. Leukefeld, the witness who testified about the treatment programs), so the district court did not simply commit a scrivener's error by substituting names; rather, it fundamentally misunderstood, or at least failed to consider, the testimony of Dr. Grundy.

B.N.M. is correct that the testimony in the first (correctly attributed) sentence could not have possibly been given by Dr. Steffan. But it does not follow that the attribution error in the subsequent sentences means that the district court

34

fundamentally misunderstood the testimony or failed to recognize that the experts gave conflicting testimony. Again, it is notable that the magistrate judge elsewhere recited much (though not all) of the conflicting testimony given by the experts.

To be sure, it is *possible* that the identity of the experts was important or that the magistrate judge and the district court failed to recognize that the expert witnesses gave conflicting evidence on certain points. But that is pure speculation, and insofar as we are left to flounder in a zone of speculation and conjecture, B.N.M. has not carried his burden under the third prong of the plain-error test.[16] Thus, B.N.M. has not demonstrated plain error, and it follows that we will not suspend our application of the firm-waiver rule. Accordingly, we conclude that the attribution issue is waived.

**B**

B.N.M. next argues that "the district court abused its discretion in its handling of the two factors that drove its transfer decision" and that "[e]ach error warrants vacating the transfer order." Aplt.'s Opening Br. at 20. Specifically, he challenges the district court's findings on the second transfer factor—the nature of the offense—and the sixth transfer factor—the availability of programs to treat the juvenile's behavioral problems. He argues that the district court's mishandling of these factors

---

[16]    In light of our conclusion that B.N.M. has failed to show that the error affected his substantial rights—that is, failed to make the *requisite* showing as to the third plain-error factor—we decline to reach the parties' arguments on the fourth prong of the plain-error test: whether the error seriously affected the fairness, integrity, or public reputation of judicial proceedings.

35

led it to the erroneous conclusion that the "risk of harm to society posed by affording

[B.N.M.] more lenient treatment within the juvenile justice system outweighs [his]

chance for rehabilitation." *Id.* at 32 (alterations in original) (quoting R., Vol. I,

at 110).

**1**

First, we will discuss the error that B.N.M. alleges occurred in the

consideration of the factor that the magistrate judge and district court found to be the

most important—the nature of the offense.  B.N.M. does not contest the district

court's finding that the murders themselves were heinous, serious crimes that are

worthy of substantial weight in the transfer analysis.  Nor could he.  The facts of this

pre-planned double homicide are undoubtedly heinous.  And it should come as no

surprise that violent, serious crimes may weigh heavily in favor of transfer.  *See*

*United States v. Robinson*, 404 F.3d 850, 858–59 (4th Cir. 2005); *United States v.*

*Male Juvenile E.L.C.*, 396 F.3d 458, 463 (1st Cir. 2005); *United States v. Nelson*,

68 F.3d 583, 590 (2d Cir. 1995); *United States v. A.R.*, 38 F.3d 699, 705 (3d Cir.

1994).

Instead, the crux of B.N.M.'s argument is that the district court abused its

discretion because "[t]he role a juvenile played in the offenses also matters" and

"[t]he district court did not account for its own finding that B.N.M. was only a

follower." Aplt.'s Opening Br. at 32, 35.  B.N.M. reiterates the court's finding that

his role in the planning and carrying out of the murders was more akin to a follower

than a leader, and he emphasizes his relatively minor role in the planning and

36

commission of the offense. He asserts that the district court improperly and summarily dismissed the importance of the finding that he was only a follower and that such a finding—which bears on his future dangerousness—should have been meaningfully considered.

We reject B.N.M.'s argument on this factor. As discussed above, "[a] district court abuses its discretion in deciding whether to transfer a juvenile to adult status when it fails to make the required factual findings or when its factual findings are clearly erroneous." *Doe*, 58 F.4th at 1157 (quoting *Leon, D.M.*, 132 F.3d at 590). Here, the district court did not clearly err in finding that the second factor weighed heavily in favor of transfer.

B.N.M. is correct that the role a juvenile played in the offense conduct can impact the calculus under the second factor. *See id.* at 1160 (approving of the district court's consideration of a juvenile's leadership role as weighing in favor of transfer); *Anthony Y.*, 172 F.3d at 1254 (same). And he is also correct that both C.V. and A.M. are arguably more culpable than he is. C.V. struck the killing blow on A.M.'s mother and was the prime mover behind the attack on A.M.'s father. And A.M. originally came up with the idea of killing her parents and played a leadership role.

But it does not follow that the district court abused its discretion in not giving *determinative* or even major weight on these facts to B.N.M.'s role as a follower. As the government cogently explains, "[t]he district court did not abuse its discretion in finding that the nature of the offense, whether [B.N.M.] was a follower or not, was especially heinous and should be accorded special weight." Aplee.'s Resp. Br. at 37.

37

In other words, there is nothing contradictory about concluding that the role that B.N.M. played was more akin to a follower than a leader *and* also that even being a mere follower in such a shocking, meticulously planned crime was worthy of substantial weight in the transfer analysis.

Despite his attempts to minimize his actions, B.N.M. still played an integral role in the killings. Among other things, B.N.M.: (1) agreed to participate in a scheme to kill A.M.'s parents; (2) suggested approaching C.V. about the scheme; (3) participated in the planning of the murders, including digging a grave for the victims; (4) used—or attempted to use—a Taser on A.M.'s mother while she was being attacked by C.V.; (5) cleaned up the evidence of the first murder, including digging another grave and burying A.M.'s mother; (6) laid in wait for A.M.'s father; (7) hit A.M.'s father over the head with a dumbbell; (8) participated in setting A.M.'s father on fire and attempting to destroy evidence; (9) stole A.M.'s father's car; and (10) planned to escape across state lines.

The foregoing conduct fully supports the finding that the second factor weighs heavily in favor of transfer—notwithstanding B.N.M.'s role as more of a follower than a leader. *See* R., Vol. I, at 97 ("[T]here is strong evidence to indicate here that the Defendant's actions were more closely associated with that of a follower than a leader[] . . . . Nevertheless, the undersigned Magistrate Judge finds that the double homicide in this case, along with the level of preparation, planning, and follow-through involved over several days, indicates it is among the most severe types of crimes and that it weighs heavily in favor of transfer."). B.N.M. has pointed to no

38

factual findings that the district court failed to make, and he has not shown any meaningful clear error, so there was no abuse of discretion.[17]

B.N.M.'s arguments to the contrary are unconvincing. He first argues that the R&R and the record contain little support that he was involved in the planning of the murders. This argument borders on frivolous. There is *substantial* evidence in the record about B.N.M.'s participation in the planning and preparation. Among other things, he suggested recruiting C.V., spoke to C.V. about killing A.M.'s parents, helped to dig the grave for the victims, and participated in planning sessions. And although the magistrate judge could have been more fulsome in making explicit findings on B.N.M.'s role in planning the murders, the magistrate judge did make findings indicating that he relied upon B.N.M.'s involvement in the planning when weighing the second factor.

Second, B.N.M. argues that the district court did not make a finding that B.N.M. initiated a conspiracy, so the unique dangers of conspiracy could not—as the government asserts—enter the calculus. But there is no reason that the district court

---

[17]    B.N.M. contends that the magistrate judge's findings on the second factor contained an inaccurate statement—that C.V. "and/or" B.N.M. used the stick to attack A.M.'s father. Aplt.'s Opening Br. at 37 (quoting R., Vol. I, at 96). According to B.N.M., the evidence presented by the government cannot support a finding that he used the stick—only that C.V. did. B.N.M. appears to be correct on this point: although it is not clear-cut, the evidence largely supports a conclusion that C.V. used the stick, not B.N.M. But even proceeding under the assumption that it was only C.V. and not C.V. "and/or" B.N.M. that used the stick, the district court did not clearly err in finding that the second factor weighed decisively in favor of transfer.

could not—as it did—weigh the coordination and planning without making a formal finding of conspiracy.

Third, B.N.M. emphasizes his subsidiary role in the offenses and that his motives "tempered" the fact that he participated in the killings. Aplt.'s Opening Br. at 41. But the district court accounted for his subsidiary role when it made the finding that he was more of a follower than a leader, and it did not clearly err by concluding that B.N.M.'s subsidiary role was outweighed by the uniquely serious facts here. Nor was it required to make additional findings on this point, as B.N.M. seemingly contends.

Ultimately, B.N.M. seeks to have us re-weigh the second factor and conclude that his role as a follower militates against transfer. But he points to no clear error, and we cannot simply substitute our judgment for that of the district court. *See Doe*, 58 F.4th at 1159. We thus reject B.N.M.'s argument that the district court abused its discretion with respect to the second factor.

**2**

The next purported error relates to the sixth transfer factor, the programs available to treat the juvenile's behavioral problems. Recall that the magistrate judge, in his R&R, noted that if B.N.M. were adjudicated as a juvenile, he would be released at twenty-one. Ultimately, the magistrate judge reasoned that although there were programs in juvenile facilities available to treat B.N.M.'s behavioral problems, such programs would no longer be available to B.N.M. after he turned twenty-one and would have to be released. The magistrate judge specifically reasoned that:

(1) particularly given his delayed intellectual abilities, B.N.M. was unlikely to be rehabilitated by the age of twenty-one; (2) programs in adult facilities could continue to be helpful to B.N.M. beyond his twenty-first birthday; and (3) there was no evidence presented at the hearing about any rehabilitative programs or family support that would be available to B.N.M. in the community if he were adjudicated as a juvenile and released at twenty-one. Thus, he concluded, the sixth factor weighed in favor of transfer. The district court largely accepted the magistrate judge's findings on the sixth factor, noting that even if it considered the possibility of juvenile delinquent supervision, as B.N.M. urged, it would not affect its conclusion on the sixth factor.

B.N.M. challenges the district court's consideration of the sixth factor, arguing that the district court clearly erred when it concluded that B.N.M. could not find treatment options in the community if he were to be released at age twenty-one. B.N.M. argues that the experts agree that he needs only "pedestrian" treatment, which would be widely available in the broader community. Aplt.'s Opening Br. at 44. He further argues that the district court erred to the extent that it weighed the lack of evidence on this point against him, asserting that the district court effectively shifted the burden from the government to him.[18]

---

[18] In his reply brief, B.N.M. raises an additional argument related to the sixth factor. He argues that because he is now over eighteen, his term of detention may extend beyond his twenty-first birthday pursuant to 18 U.S.C. § 5037(c)(2)(A)(i) —specifically, if he were adjudicated as a juvenile delinquent at this point, he could be held for five years. According to B.N.M., when making the transfer decision, the district court and the magistrate judge considered only the possibility that he could be

We are unpersuaded. The district court's conclusion on the sixth factor is largely driven by its finding that although there are programs in juvenile facilities that could provide rehabilitative services, it is unlikely that B.N.M. would be rehabilitated by the time he turned twenty-one and would have to be released from juvenile detention—and, by extension, could no longer avail himself of the programs available in those juvenile detention facilities. B.N.M. has not shown that this finding was clearly erroneous. *See Doe*, 58 F.4th at 1157 ("A district court abuses its discretion in deciding whether to transfer a juvenile to adult status when it fails to make the required factual findings or when its factual findings are clearly erroneous." (quoting *Leon, D.M.*, 132 F.3d at 590)).

To begin, the district court acted within its wide discretion when, after concluding that there were treatment programs available at juvenile facilities, it considered the amount of time that B.N.M. could be treated at those facilities. Inquiring into the amount of time that a juvenile could be treated before they would have to be released is proper under the sixth transfer factor. *See id.* at 1158; *see also United States v. J.J.*, 704 F.3d 1219, 1223 (9th Cir. 2013); *Nelson*, 68 F.3d at 591; *United States v. Mason*, 495 F. App'x 373, 375 (4th Cir. 2012).

---

held until his twenty-first birthday (which was the maximum based on B.N.M.'s age at the time of the transfer hearing and order) and did not consider the five-year maximum that is now applicable. To the extent that B.N.M. raises this as an independent ground for vacatur, we need not—and do not—decide this issue because B.N.M. did not raise it in his opening brief, and ordinarily we deem arguments raised for the first time in a reply brief to be waived. *See United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019).

Moreover, the finding that B.N.M. would not be rehabilitated by the time that he would have to leave juvenile detention—when the rehabilitative programs available for juveniles would no longer be available to him—was not clearly erroneous. The district court considered the relatively small window of time in which B.N.M. could be treated in a juvenile facility, as well his delayed intellectual abilities, in coming to this conclusion. These findings are well-supported by the record, including the testimony of Dr. Grundy and Dr. Steffan. So is the district court's finding that if B.N.M. were to be released at the age of twenty-one, he would not have the family support he would need to ensure his rehabilitation.

Furthermore, because there was no burden of proof on the government to begin with under the sixth factor regarding the availability of programs in the broader community (that is, the community outside of juvenile detention facilities or adult prisons), the district court could not have erred by "shifting" that nonexistent burden to B.N.M. More specifically, we have never required the government to prove, as part of the sixth factor, that there are no programs in the broader community that could aid the juvenile's rehabilitation if the juvenile were not transferred to adult status and instead released from detention at the age of twenty-one. Indeed, a survey of our case law revealed no case in which we put a burden on the government to show that there were no programs available in the broader community.

Instead, the crux of the sixth factor is whether there are available rehabilitative programs within juvenile facilities that could treat the juvenile's behavioral problems. *See Doe*, 58 F.4th at 1158 (concluding that the district court did not err in

43

finding the sixth transfer factor to be "a wash" when the district court concluded that there were treatment options in both adult and juvenile facilities and that the juvenile would have to leave on her twenty-first birthday); *McQuade Q.*, 403 F.3d at 721 (concluding that the record supported the district court's finding on the sixth factor that juvenile facilities were not capable of handling the juvenile's unique, intensive needs); *see also Nelson*, 68 F.3d at 591 (noting that the district court must inquire into which juvenile programs are available, how the juvenile would fit into such programs, and "how much time he would serve as a juvenile"); *see generally* 9B Van Arsdale et al., *supra*, § 22:2523 ("It is incumbent on the court to deny the motion to transfer when, all things considered, the juvenile has a realistic chance of rehabilitative potential in available treatment facilities in the period of his or her minority.").

The district court may also consider whether programs in adult facilities would be more likely to accomplish the goals of rehabilitation. *See Doe*, 58 F.4th at 1158; *see also Nelson*, 68 F.3d at 591 ("Even where a district court determines that there is a better chance of rehabilitation in adult programs, it must base the decision on a comparison of adult and juvenile facilities."); *J.J.*, 704 F.3d at 1223 (concluding that the district court did not clearly err or abuse its discretion in its comparison of programs available at juvenile and adult facilities).

Admittedly, here, the magistrate judge (and by extension, the district court) *did* consider "the lack of rehabilitative programs available to the Defendant should he be released into the community at the age of twenty-one" in its discussion of the sixth

44

factor.  R., Vol. I, at 110.  Nevertheless, the key inquiry for the sixth factor is whether there are available programs in juvenile facilities that could rehabilitate the juvenile—as well as, relatedly, whether the adult facilities would in fact be more likely to further the statute's rehabilitative goals.  The fact that the magistrate judge made a finding about the lack of programs available in the community does not undercut the well-supported findings on this key inquiry.  Indeed, the magistrate judge's discussion of the availability of community programs simply defined a brief, additional point of contrast with "the availability of programs within the BOP while he is a juvenile *and* should he be transferred as an adult."  *Id.*  This sort of tangential reference is not enough to support B.N.M.'s contention that the magistrate judge— and by extension the district court—erred by shifting a burden of proof to him regarding the availability of community programs.

We are thus satisfied that there was no abuse of discretion in the consideration of the sixth transfer factor.

## C

Finally, B.N.M. argues that he "cannot be transferred to face an adult charge of first-degree murder because the only two penalties for that offense—mandatory life in prison without parole or death—cannot constitutionally be imposed on him" because he was a juvenile when he committed the offense.  Aplt.'s Opening Br. at 47.  We need not linger long over this constitutional claim because it is not yet ripe for adjudication.

45

The juvenile in *Doe*—who was, in fact, A.M.—raised precisely the same argument, and we concluded that her "argument [wa]s unripe because her potential punishments rely upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" such as her actually being convicted of first-degree murder. 58 F.4th at 1155 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). B.N.M. concedes that we are bound by *Doe* and, as such, his constitutional claim is necessarily unripe and nonjusticiable. He further concedes that he raises this argument for preservation purposes only. In light of *Doe*—and B.N.M.'s concessions—we need not address this issue further.

## V

Accordingly, for the foregoing reasons, we **AFFIRM** the transfer of B.N.M. for adult prosecution.