FILED
United States Court of Appeals
Tenth Circuit

May 29, 2025

Christopher M. Wolpert
Clerk of Court

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

PERRY MARYBOY,

    Defendant - Appellant.

No. 23-4117

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 4:18-CR-00119-DN-1)**

_____

Jacob R. Rasch-Chabot, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant.

Nathan Jack, Assistant United States Attorney (Trina A. Higgins, United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

_____

Before **HARTZ**, **PHILLIPS**, and **FEDERICO**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

    Two errors in the trial court may have led a jury to convict Perry Maryboy of second-degree murder instead of the lesser-included offense of involuntary manslaughter. Though satisfying plain-error review is difficult, we

conclude that Maryboy has met its requirements, and we thus reverse Maryboy's conviction and remand for a new trial.

## BACKGROUND

### I.     Factual Background

On April 13, 2018, Perry Maryboy shot and killed Antonio Montowine as they stood outside their vehicles parked alongside county road 443 somewhere near Bluff, Utah. The parties presented rival accounts at trial. Maryboy claimed that he accidentally killed Montowine when his firearm shot prematurely as he extended his arm upward to fire a warning shot. The government claimed that Maryboy had acted intentionally and deliberately when he fired "a kill shot to the back of Mr. Montowine's head." R. vol. IV, at 476. Alternatively, the government argued that even if Maryboy fired a warning shot, he would have acted extremely recklessly, meaning that the jury could still find malice aforethought for that conduct, and thus second-degree murder. *Id.* at 1793–95.

In their jointly proposed jury instructions, the parties contemplated the court's instructing on self-defense. *See* R. vol. I, at 189–90, 192 (Joint Instruction Nos. 26 & 28). For self-defense, the government must disprove the defense beyond a reasonable doubt. Perfect self-defense is a complete defense to second-degree murder and occurs when a defendant "use[s] force which is intended or likely to cause death or great bodily harm" and the defendant "reasonably believes that [the] force is necessary to prevent death or great bodily harm to himself." R. vol. II, at 221 (Instruction No. 38); *see also United*

2

*States v. Britt*, 79 F.4th 1280, 1286–87 (10th Cir. 2023). Imperfect self-defense is a partial defense that mitigates murder to involuntary manslaughter. It occurs when a defendant subjectively "acts in self-defense, but it was not reasonable for him to think that the force used was necessary to defend himself against an immediate threat." R. vol. II, at 223–24 (Instruction No. 40); *Britt*, 79 F.4th at 1286–87.

At trial, Montowine's common-law wife, Rachel Green, testified for the government, and Maryboy testified in his own defense.

## A.    Ms. Green's Testimony

Ms. Green testified that April 13, 2018, was her 31st birthday. To celebrate, she and Montowine drank alcohol and smoked marijuana at their home. Later that day, Ms. Green became upset about the couple's shared lifestyle, and they decided to break up. They, along with Ms. Green's minor son, got into their van and began driving to Ms. Green's aunt's house to tell her the news. While driving down county road 443, Montowine spotted a white truck that was parked alongside a dirt road that Ms. Green believed led to her grandmother's old sheep-herding hogan. Ms. Green and Montowine mistakenly thought the road was somehow part of Ms. Green's grandmother's land and thus that the truck was trespassing.[1] Montowine asked if he should pull over and tell the truck's driver to leave, and Ms. Green said yes. Though Ms. Green was

---

[1] Ms. Green's grandmother once had a grazing permit for some land somewhere down the dirt road, but that limited interest ceased on her death.

"frustrated" because she thought someone was on her family's land, she testified that Montowine remained calm. R. vol. IV, at 1139. Montowine made a U-turn and parked at an angle behind the white truck. This demonstrative exhibit from the trial represents the scene:



Supp. R. vol. I (Gov't Ex. 2-3F).

Ms. Green testified that Montowine left the van and approached the passenger-side window of the truck. After less than a minute, she said, Montowine walked back toward the middle of the truck bed, and the driver (Maryboy) got out of his truck to stand across from Montowine. Ms. Green could not discern all that they were saying because she was still in the van, but she did hear Montowine say, "Oh, you have a .38." R. vol. IV, at 1142, 1146.

She saw Maryboy point the gun upward, and she thought she may have heard a gunshot. Ms. Green scooted to the driver's side of the van, exited it, and began yelling at Maryboy. Montowine returned to the driver's side of the van and calmly convinced her to get back inside it. As Montowine faced the driver's door of the van, Ms. Green saw him suddenly drop to the ground. She heard no gunshot, but she soon saw that Montowine had sustained a gunshot wound to the back of the head. As Maryboy stood still, Ms. Green screamed at him. Maryboy walked back to his truck and drove away. Eventually Ms. Green and her son were able to move Montowine's body out of the way from the driver's door so she could drive to her aunt's house for help.

### B.     Maryboy's Testimony

Maryboy testified differently. He said that he had been on his way home from work when he pulled over to the side of the road to use his phone, knowing the area had good cell reception. He noticed a van drive by in the opposite direction but did not realize it had pulled in behind him until a man appeared at his passenger window. At first, the man (Montowine) just stared at Maryboy from the passenger window with a crazy look in his eyes. Then Montowine began screaming expletives at Maryboy. Maryboy could not see Montowine's hands and was afraid that he might be armed. Maryboy repeatedly asked Montowine, "What do you want?" and told him to show his hands. *Id.* at 1622–23. When Montowine didn't do so, Maryboy stepped out of his truck and obtained his .357 revolver from its holster on the backseat, loading it with

5

two cartridges. The two men stood directly across the truck bed from each other, each near a rear tire. Maryboy continued to tell Montowine to show his hands, but Montowine never did—he just stared blankly and continued to yell expletives.

Then Maryboy fired a warning shot in the air, but Montowine didn't flinch. Maryboy said this lack of reaction scared him even more. So Maryboy fired a second warning shot, and Montowine dropped to the ground. After he fell, Maryboy could not see him. Maryboy said he didn't understand why Montowine had dropped to the ground, but he fully expected him to get back up. Then Maryboy saw the passenger door of the van open and a female (Ms. Green) step from the van. Maryboy testified that Ms. Green said nothing but "just look[ed] at [him] for a while." *Id.* at 1641. Then Maryboy peeked around the end of his truck to see what had happened to Montowine and saw him lying on the ground. Ms. Green walked over to where Montowine was lying, and without screaming or yelling, she kept looking back and forth between Maryboy and Montowine. Still not understanding what happened, Maryboy got scared, got back in his truck, and drove away. Though he didn't then believe he had shot Montowine, he testified that he realized later that he must have prematurely fired the second warning shot as he was raising the gun in the air. Maryboy stated that he had feared for his life but that he never intended to shoot Montowine.

6

Montowine was shot in the back right side of the head. At death, his blood-alcohol concentration was .237. Montowine was about 6'2", 257 pounds, and 31 years old. Maryboy is about 5'9" and was 200 pounds and 54 years old.

## II.    Procedural History

A federal grand jury indicted Maryboy on two counts: second-degree murder while within Indian Country, in violation of 18 U.S.C. §§ 1111, 1153(a); and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). Trial began in May 2022, but because of the Covid-19 pandemic and positive Covid tests, the district court declared a mistrial. A second trial started on May 5, 2023, and lasted ten days.

At trial, Maryboy stipulated that he killed Montowine, that he (Maryboy) is an Indian, that the killing occurred in Indian Country, and that second-degree murder is a crime of violence as defined in 18 U.S.C. § 924(c)(3). That left the jury with just one disputed element—whether Maryboy had acted with the requisite mental state of malice aforethought. If the government proved malice aforethought beyond a reasonable doubt, then the jury could convict Maryboy of both the second-degree murder and § 924(c) charges. But if the government failed to do so, the jury would be left to consider whether to convict Maryboy of the lesser-included offense of involuntary manslaughter or fully acquit him, because only second-degree murder would satisfy § 924(c)'s crime-of-violence requirement. The court also instructed the jury on perfect self-defense as a

7

defense to the second-degree-murder charge, and included imperfect self-defense in its involuntary-manslaughter instruction.

The jury adjudged Maryboy guilty of both second-degree murder and the § 924(c) charge, thus necessarily rejecting Maryboy's perfect self-defense theory. The jury instructions allowed the jury two independent options for rejecting perfect self-defense: (1) that Maryboy did not (subjectively) act to defend himself or (2) that Maryboy used unreasonable force or faced no immediate threat. R. vol. II, at 219 (Instruction No. 37). The general verdict form does not reveal for which basis the jury found no perfect self-defense.

The district court sentenced Maryboy to 180 months' imprisonment for second-degree murder and the mandatory consecutive 120 months' imprisonment for the § 924(c) conviction. Maryboy has timely appealed, arguing we should reverse his conviction for two reasons: (1) that the government's expert witness improperly opined on Maryboy's mental state, in violation of Federal Rule of Evidence 704(b); and (2) that the district court failed to instruct the jury about imperfect self-defense for the second-degree-murder charge and the government's need to disprove that affirmative defense beyond a reasonable doubt. We have appellate jurisdiction under 28 U.S.C. § 1291.

**STANDARD OF REVIEW**

We review Maryboy's two appeal issues for plain error.[2] *United States v. Mendoza-Salgado*, 964 F.2d 993, 1008 (10th Cir. 1992). "A party seeking relief under the plain-error rubric bears the burden of showing (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights." *United States v. B.N.M.*, 107 F.4th 1152, 1170 (10th Cir. 2024) (internal quotation marks omitted). If these prongs are satisfied, we may exercise our discretion to correct the error if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted).

---

[2] Maryboy acknowledges he failed to object to the jury instructions but argues he preserved his Rule 704(b) claim by objecting to the "form" of the government's questions bearing on mens rea to its expert witness. Op. Br. at 17 (citing *United States v. Burgess*, 99 F.4th 1175, 1189 (10th Cir. 2024)). In *Burgess*, we concluded that "intersperse[d] objections" warranted reviewing de novo Burgess's prosecutorial-misconduct claim. *Id.* But we have also repeatedly required that "the specific ground for reversal on *an evidentiary ruling* [] mirror the objection raised at trial[.]" *United States v. Mendoza-Salgado*, 964 F.2d 993, 1008 (10th Cir. 1992) (emphasis added) (concluding that the objections to relevance and prejudice did not preserve a Federal Rule of Evidence 404(b) issue for appeal); *Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1331 (10th Cir. 1984) (finding that appellant waived the foundation and hearsay challenges to an exhibit because he objected for cumulativeness at trial); *Markel Serv., Inc. v. Nat'l Farm Lines*, 426 F.2d 1123, 1128 (10th Cir. 1970) (appellant's objection to memo as "self serving" and "incompetent, irrelevant and immaterial" "did not appropriately raise lack of proper foundation for past memory stated or the hearsay objection"); *see also Lieberman v. Washington*, 128 F.3d 1085, 1095 (7th Cir. 1997) (applying plain error because "object[ing] to the 'form of the question' . . . [is] clearly a different ground than that upon which [the defendant] now bases his appeal."). Because we find that Maryboy satisfies plain error review, we need not decide whether Maryboy's form objection preserved his Rule 704(b) claim.

9

## DISCUSSION

First, Maryboy argues that the government's expert witness impermissibly opined on Maryboy's mental state in violation of Federal Rule of Evidence 704(b). The expert repeatedly opined that Maryboy's conduct in firing a warning shot was extremely reckless behavior. And as we later discuss, the jury instructions authorized a finding of malice aforethought (the mens rea for second-degree murder) by proof of extremely reckless conduct.

Second, Maryboy argues that the court's second-degree-murder instruction was erroneous for ignoring *im*perfect self-defense and the government's burden to disprove that affirmative defense beyond a reasonable doubt. Because imperfect self-defense negates malice aforethought, *see United States v. Sago*, 74 F.4th 1152, 1153–54 (10th Cir. 2023), Maryboy argues that the jury may have wrongly convicted him of second-degree murder.

The district court instructed the jury on malice aforethought as follows:

> To kill "with malice aforethought" means to kill another person deliberately and intentionally, or with intent to do serious bodily harm, or to act with callous and wanton disregard for human life. Malice aforethought may be established by evidence of conduct that is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that it can be reasonably inferred that the defendant was aware of a serious risk of death or serious bodily harm.

R. vol. II, at 219 (Instruction No. 37); *see also* Tenth Circuit Criminal Pattern Jury Instructions No. 2.53 cmt. (2023). The court "further clarif[ied]" in the involuntary-manslaughter instruction that "Second Degree Murder involves

reckless and wanton disregard for human life that is extreme in nature[.]" R. vol. II, at 223 (Instruction No. 40) ("[W]hile Involuntary Manslaughter involves reckless and wanton disregard that is not extreme in nature."); *see also* Tenth Circuit Criminal Pattern Jury Instructions Nos. 2.53 & cmt, 2.54.1 cmt.

Whether and how the two alleged errors affected the jury's verdict depends on the basis for the jury's malice-aforethought finding. If the jury determined that Maryboy fired a "kill shot" as the government asserted, thus killing Montowine "deliberately and intentionally," R. vol. II, at 219, then the alleged errors would not have affected his conviction.[3] If the jury instead determined that Maryboy had acted with "callous and wanton disregard for human life," *id.*, when he fired the killing warning shot, then both the Rule 704(b) error and the jury instruction error may have affected the verdict. *See also United States v. Pearson*, 203 F.3d 1243, 1271 (10th Cir. 2000) (describing second-degree murder based on callous and wanton disregard for human life as "depraved-heart" murder). We address each error in turn, including whether the error individually warrants reversal, and then we conclude with whether the errors cumulatively warrant reversal.

---

[3] Though a defense of imperfect self-defense could mitigate an intentional shooting, Maryboy argues that he did not intend to shoot Montowine while firing a warning shot in self-defense. *See* R. vol. IV, at 478, 481, 484–85. So the jury could not credit Maryboy's testimony and still conclude that Maryboy intentionally killed Montowine in self-defense.

11

## I.    Rule 704(b) – Improper Expert Testimony

"In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). Maryboy argues the government's expert witness violated Rule 704(b) by repeatedly testifying that Maryboy's conduct had been extremely reckless, because the instructions told the jury that extremely reckless conduct would suffice to establish malice aforethought. For the reasons discussed below, we agree.

### A.    Agent Olson's Expert Testimony

At trial, the government elicited from former FBI Special Agent James Olson, its firearms expert, what he described as four cardinal rules of gun safety—keep your finger off the trigger, treat every gun like it's loaded, keep the muzzle pointed in a safe direction, and be aware of your target and what lies beyond your target.

He also testified in response to three hypothetical scenarios posed by the prosecutor. The third hypothetical tracked the facts here. It involved a man standing behind a truck who, in the process of firing a warning shot, accidentally shoots another person in the head from about 6–8 feet away as that person stood facing the open driver's door to a van and away from the shooter; and the van containing a woman and her son inside. The government used Exhibit 2-3F (earlier shown in this opinion) to illustrate this hypothetical. The

12

prosecutor first asked whether those hypothetical facts would be consistent with the person's being shot in the back of the head (yes). He next asked whether such a shooter would have violated any of the previously mentioned cardinal rules of gun safety (yes, all four).

During his testimony, Agent Olson used the term "reckless" several times. First, on direct examination, while explaining how Maryboy had violated the second cardinal rule of gun safety, Agent Olson testified that "it was [] at least cavalier, if not gross -- grossly negligent reckless to point a loaded weapon at another person." R. vol. IV, at 1505. Second, on redirect, while explaining how Maryboy had violated the fourth cardinal rule, Agent Olson testified that "[i]f this is my target and what is beyond that [are the occupants of the van], that is reckless." *Id.* at 1540. Third, still on redirect, the government asked, "You just used the term reckless. That scenario that we just went through, *how reckless* is that act?" *Id.* (emphasis added). Maryboy "object[ed] to the form of the question." *Id.* at 1540–41. After the court overruled the objection, Agent Olson answered, "Any time that you handle a weapon in an unsafe manner it could take another human life. And so to me that's *the ultimate expression of recklessness*." *Id.* at 1541 (emphasis added). The government followed up by asking, "How would you compare that scenario to being *extremely reckless*? Using *extremely reckless* as a point of reference, how would you compare that scenario that you just described to that standard?" *Id.* (emphasis added). Again, Maryboy "object[ed] to the form of that

13

question." *Id.* This time, the court sustained the objection, and the government rephrased: "Do you understand -- you understand in your experience of what is *extremely reckless*? . . . Just using your own understanding . . . how does that scenario compare with your experience?" *Id.* (emphasis added). Again, Maryboy objected to the form, and again the court sustained the objection. On recross, Maryboy asked, "Is it reckless to want to protect yourself from another individual who you believe has the manner and possibly the means to kill you?" *Id.* at 1542. Agent Olson answered, "No." *Id.*

### B.    Waiver

The government argues that Maryboy waived any Rule 704(b) challenge by "effectively conced[ing] recklessness" in closing arguments. Resp. Br. at 25–27. Waiver is the "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks omitted). The government asserts that Maryboy abandoned his misfired-warning-shot theory to "focus on [his] supposed self-defense belief in hopes of full acquittal" by stating, among other things, that Montowine was shot standing in front of the van (and not standing across the truck bed from Maryboy as Maryboy had testified). Resp. Br. at 25–26. And the government asserts that because it had primarily argued that Maryboy "deliberately shot Montowine," "[r]ecklessness only mattered . . . if the jury believed Maryboy's account over Green's." *Id.* at 26. And the government argues that the jury could not do so, because in closing argument, defense counsel impeached Maryboy's

14

credibility by conceding that Maryboy was wrong about where Montowine was standing when Maryboy shot him.

We agree with Maryboy that "[d]efense counsel did no such thing." Reply Br. at 1. Though counsel did acknowledge that Montowine died near the van, that is not irreconcilable with the misfired-warning-shot defense; Maryboy could have intended to fire a warning shot regardless of whether Montowine was shot while standing at the back tire directly across the truck bed from Maryboy, as Maryboy testified, or where his body lay six to eight feet away from the van (and still on the other side of the truck bed), as defense counsel contended in closing. Because of the position of the van, Maryboy could have accidentally shot Montowine in the back right side of the head in either scenario. And defense counsel's actual statement shows that he did not concede the issue: "And yeah, he died instantaneously [near the van], but if he was moving -- and I asked this of the medical examiner -- yeah, momentum can carry you a little bit further." R. vol. IV, at 1807.

The government also argues that defense counsel waived the Rule 704(b) issue by "repeatedly label[ing] Maryboy's behavior as reckless," and lists six instances from Maryboy's closing argument in support.[4] Resp. Br. at 25. But as

---

[4] R. vol. IV, at 1816 ("How on earth did this start? How did the reckless activity in this case begin?"); *id.* at 1817 ("I wasn't thinking about what the rules of safety were. I was thinking about my life."); *id.* at 1818 (Even though Maryboy "knew what the rules were," "it is a little bit different" because he was afraid); *id.* ("Dangerous? You bet. This man thought he was going to die.

(*footnote continued*)

15

Maryboy correctly explains, the government takes those quotes out of context. They do not label *Maryboy* as reckless. Instead, they argue either that Maryboy was *not* reckless or that Montowine and Ms. Green were the reckless ones. For example, when counsel stated (from Maryboy's perspective), "I wasn't thinking about what the rules of safety were. I was thinking about my life," counsel was not conceding that Maryboy had acted recklessly—counsel was arguing that Maryboy acted *reasonably* by not stopping to consider gun safety because his life was in danger. *See* R. vol. IV, at 1817. And when defense counsel rhetorically asked, "How did the reckless activity in this case begin?," he answered by stating that it did not start with Maryboy and that "the cause of recklessness in this case, from soup to nuts, was Antonio Montowine's and [Ms. Green's] doing." *Id.* at 1816–19.

None of counsel's statements conceded that Maryboy was reckless. Rather, counsel affirmatively argued in closing that "[t]hey were warning shots, not reckless." *Id.* at 1804. Simply put, Maryboy did not waive this issue.

---

He raised the gun up, it went off, and that is exactly what happened."); *id.* at 1819 ("It is a tragedy that Antonio Montowine died that night. . . . But the cause of the recklessness in this case, from soup to nuts, was Antonio Montowine's and [Ms. Green's] doing."); *id.* at 1821 ("[Montowine's and Ms. Green's] [r]ecklessness that causes what he [the prosecutor] says is [Maryboy's] reckless behavior means that the presumption of innocence and proof beyond a reasonable doubt says that you must acquit him of second degree murder [because he had no duty to retreat and acted to defend himself].").

16

C.    **Plain-Error Review**

1.    **Error**

Expert testimony violates Rule 704(b) when it asserts a final conclusion or inference that the defendant acted with the requisite mens rea. *See United States v. Wood*, 207 F.3d 1222, 1236 (10th Cir. 2000) ("If believed, [the expert's] testimony necessarily dictates the final conclusion that Dr. Wood possessed the requisite mens rea for involuntary manslaughter."); *see also Diaz v. United States*, 602 U.S. 526, 534 (2024) ("That opinion [about most drug couriers] does not necessarily describe Diaz's mental state. . . . Diaz may or may not be like most drug couriers."); *United States v. Dennison*, 937 F.2d 559, 565 (10th Cir. 1991) ("[T]he necessary inference was that the instant defendant did not have the capacity to form specific intent . . . because of the combined effects of his intoxication and mental illness."). In *Wood*, though the expert did "not cast [his opinion—that the defendant's conduct was '*reckless*' because it was '*fraught with the perils of causing death*'—] in precisely the same terminology as the statute, case law, or instruction," it violated Rule 704(b) because it was "substantively indistinguishable" from involuntary manslaughter's required mens rea of gross negligence, which may be satisfied by showing a "reckless disregard for human life." 207 F.3d at 1236 (second emphasis added) (internal quotation marks omitted).

The same is true here.[5] Second-degree murder requires malice

aforethought, which "may be established by evidence of conduct that is reckless

and wanton, and a gross deviation from a reasonable standard of care" or by a

_____

[5] The dissent contends that Agent Olson's testimony complied with Rule 704(b) by addressing only the *objective* component of recklessness (the conduct) and not the subjective component (awareness of the risks of the conduct). Dissenting Op. at 7. But that fails to account for *Wood*'s contrary direction.

In *Wood*, the medical expert testified that Dr. Wood's actions were "reckless" because they were "fraught with the perils of causing death." 207 F.3d at 1236. Here, Agent Olson testified that Maryboy's conduct was "the ultimate expression of recklessness" because "it could take another human life." R. vol. IV, at 1540–41. In *Wood*, the requisite mens rea was a "reckless . . . disregard for human life." 207 F.3d at 1236. Here, the requisite mens rea is a "reckless and wanton disregard for human life that is extreme in nature." R. vol. II, at 223 (Instruction No. 40); *see also id.* at 219 (Instruction No. 37) ("[T]o act with callous and wanton disregard for human life."). In *Wood*, the testimony did not "merely provide the facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state," but instead "*necessarily dictate*[d] the final conclusion that Dr. Wood possessed the requisite mens rea for involuntary manslaughter." 207 F.3d at 1236 (emphasis added). So the same is true here.

The dissent asserts that *Wood* is "probably distinguishable," and that it is incompatible with the Supreme Court's decision in *Diaz v. United States*. Dissenting Op. at 6–7 n.2. In *Diaz*, the Court rejected the defendant's argument that the government's expert witness "functionally stated an opinion about whether Diaz knowingly transported drugs when he opined that couriers generally transport drugs knowingly." 602 U.S. at 535 (cleaned up). It explained that testimony "about the knowledge of *most* drug couriers" did not violate Rule 704(b) because the defendant "may or may not be like most drug couriers," and it contrasted that testimony with testimony about "all people in the defendant's shoes," which would necessarily include the defendant. *Id.* at 534–36. Though *Diaz* is relevant to our discussion of whether Agent Olson's testimony about hypothetical scenarios violates Rule 704(b), it does not affect our finding in *Wood* that expert testimony that is "substantively indistinguishable" from the jury instruction on the required mens rea violates Rule 704(b). *See Wood*, 207 F.3d at 1236. So in our view *Wood* still controls here.

"reckless and wanton disregard for human life that [unlike conduct amounting to involuntary manslaughter] is extreme in nature."[6] R. vol. II, at 219 (Instruction No. 37), 223 (Instruction No. 40); *see also Wood*, 207 F.3d at 1228–29; Tenth Circuit Criminal Pattern Jury Instructions No. 2.53 cmt. Based on that definition, which was presented to the jury, Agent Olson's testimony ran afoul of Rule 704(b). In response to the government's asking Agent Olson to describe *how reckless* the shooter in the hypothetical would be, Agent Olson testified that the conduct would be "the *ultimate expression of recklessness*" because "[a]ny time you handle a weapon in an unsafe manner it could take another human life." R. vol. IV, at 1540–41 (emphasis added). A jury could rightfully consider the words "ultimate expression of recklessness"

---

[6] Relying on cases like *Janis*, *Borden*, and *Kepler*, the government argues that extreme recklessness does not necessarily satisfy the requirements of malice aforethought, because malice aforethought "always involves 'consciously directed' force" and extremely reckless conduct does not always involve such force. Resp. Br. at 31 (quoting *Janis v. United States*, 73 F.4th 628, 631 (8th Cir. 2023); and citing *Borden v. United States*, 593 U.S. 420 (2021) and *United States v. Kepler*, 74 F.4th 1292, 1304 (10th Cir. 2023)); *see also* Oral Argument at 17:30–17:43, 17:56–18:02. But the government does not seem to be asserting that our jury instructions on malice aforethought are erroneous, and we fail to see how these cases, which consider which mental states may satisfy § 924(c)'s and § 924(e)'s force clauses ("the use, attempted use, or threatened use of physical force against the person . . . of another") so that a crime may qualify as a crime of violence or a violent felony, *see Kepler*, 74 F.4th at 1302–03, have any bearing on this appeal. We see no dispute over whether Maryboy consciously directed force *against* Montowine, just whether his intentional conduct was so "reckless and wanton" that a jury could reasonably infer that Maryboy "was aware of a serious risk of death or serious bodily harm." *Wood*, 207 F.3d at 1228 (internal quotation marks omitted).

as establishing "extreme recklessness." And that the conduct "could take another human life" shows a "disregard for human life." That is malice aforethought. *See* Resp. Br. at 31 (the government acknowledging that "malice aforethought *may be established* by evidence of conduct that is reckless and wanton and a gross deviation from a reasonable standard of care" so long as the "reckless and wanton disregard for human life [] is *extreme in nature*").[7]

Indeed, the government argued as much at trial. In closing argument, it told the jury, "If you find it was extreme recklessness, you don't even have to go to [the involuntary-manslaughter instruction]. Why? Because you have already decided that the defendant committed second degree murder by, at a bare minimum, acting with extreme recklessness."[8] R. vol. IV, at 1795. Obviously, the government did this because it understood that a mens rea of extreme recklessness would allow the jury to find malice aforethought.

That Agent Olson testified about a "hypothetical" person does not make the statement permissible. *See Dennison*, 937 F.2d at 565 ("Although

---

[7] If the government emphasizes "may be established" to convince us that a defendant's acting with reckless and wanton disregard for human life that is extreme in nature does not necessarily act with malice aforethought, we reject that argument. In this context, we read "may" as referring to whether such evidence was presented at trial.

[8] *See also* R. vol. IV, at 1795 ("[T]he difference between -- in terms of recklessness -- between second degree murder and involuntary manslaughter, *second degree murder is extreme recklessness*, and [in]voluntary manslaughter is something less." (emphasis added)); *id.* ("That's extreme recklessness. And that . . . completely takes your consideration out of involuntary manslaughter.").

Dr. Siegal's testimony was premised on a hypothetical person . . . , the necessary inference was that the instant defendant did not have the capacity to form specific intent[.]"); *Diaz*, 602 U.S. at 535–36 ("[A]n expert who testifies at an arson trial that all people in the defendant's shoes set fires maliciously . . . violate[s] Rule 704(b)" even though "the expert never spoke the defendant's name[.]"). The critical question is whether the opinion "allows the fact finder to make an additional inference as to whether the defendant had the mental state or condition constituting an element of the crime charged." *United States v. Goodman*, 633 F.3d 963, 970 (10th Cir. 2011). In *Goodman*, the expert could testify about whether the hypothetical conduct was consistent with the behavior of someone with PTSD because he did not opine about the defendant's sanity. *Id.* Not so here. If the jury credited Agent Olson's testimony that the hypothetical conduct would be "the ultimate expression of recklessness" because it "could take another human life," then the jury would not need to make any additional inferences as to whether Maryboy's conduct would qualify as a "reckless and wanton disregard for human life that is extreme in nature[.]" R. vol. II, at 223 (Instruction No. 40); *Wood*, 207 F.3d at 1229. That is "precisely the sort of testimony Rule 704(b) is designed to prevent." *Wood*, 207 F.3d at 1236.

The government makes three arguments that we reject after examining the trial record. First, the government asserts that Agent Olson's opinion "wasn't clearly about the scenario of firing a warning shot; it could have been

21

about the possibility of 'tak[ing] another human life' generally." Resp. Br. at 32 (quoting R. vol. IV, at 1541). But the government asked Agent Olson, "That scenario that we just went through, how reckless is that act?" R. vol. IV, at 1540. The referenced scenario was one in which a person was "attempting to shoot fire [sic] a warning shot at 45 degrees[.]" *Id.* at 1539. Second, the government asserts that the words "ultimate expression of recklessness" are not "clearly a statement on the *severity* of the recklessness[.]" Resp. Br. at 32. It argues that "a quintessential example of ordinary recklessness could also be an 'ultimate expression of recklessness.'" *Id.* But we conclude otherwise, given that the government's question was "[h]ow reckless was that act?" R. vol. IV, at 1540–41. The question and answer were about the *degree* of recklessness, and "ultimate expression of recklessness" fits nicely within "extremely reckless." Third, the government argues that Agent Olson "used the term ['reckless'] in its colloquial sense," not as a legal conclusion. Resp. Br. at 32. But Agent Olson's statements substantively tracked the language in the jury instructions, so it's unlikely the jury understood him to be speaking in a nonlegal sense.

By stating that the hypothetical-person's conduct was the "ultimate expression of recklessness" because it could "take another human life," Agent Olson opined that Maryboy had the requisite mental state for second-degree murder. This was error under Rule 704(b).

22

### 2.    Plain

"An error is plain if it is clear or obvious under current, well-settled law." *United States v. Cantu*, 964 F.3d 924, 935 (10th Cir. 2020) (internal quotation marks omitted). Maryboy's trial was in May 2023. All the cases cited above, except for the Supreme Court's decision in *Diaz*, were decided well before 2023. Our decisions in *Wood*, 207 F.3d at 1236 (substantively similar terminology) and *Dennison*, 937 F.2d at 565 (hypotheticals) make the error plain here. So Maryboy has satisfied the second prong of plain-error review.

### 3.    Substantial Rights

Under plain-error review, Maryboy must establish prejudice, which occurs if Maryboy's substantial rights were affected by the error. *B.N.M.*, 107 F.4th at 1170. A defendant's substantial rights are affected "when the defendant demonstrates that there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Rosales-Miranda*, 755 F.3d 1253, 1258 (10th Cir. 2014) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Hasan*, 526 F.3d 653, 665 (10th Cir. 2008) (internal quotation marks omitted). The trial record undermines our confidence that the jury would still have convicted Maryboy of second-degree murder without the error. Thus, we conclude that Maryboy's substantial rights were affected.

Maryboy offers five reasons for finding prejudice. Two of them—that "expert opinions are uniquely persuasive to juries" and that "[t]he risk of prejudice is compounded when the testifying expert is a police officer," Op. Br. at 25–26—are not persuasive. The district court instructed the jury to "judge the testimony of law enforcement officers by the same standards as the testimony of other witnesses." R. vol. II, at 211. Though such an instruction does not foreclose a finding of prejudice, it weighs against it. And it would be too easy to violate Rule 704(b) if we unduly emphasized the "expert" and "police officer" statuses.

But the other three reasons—that "the inadmissible evidence bore directly on the only disputed element of second-degree murder," that the mens reas for second-degree murder and involuntary manslaughter are "remarkably similar," and that "the government's closing emphasized that the jury should convict Mr. Maryboy of second-degree murder based on a mens rea of [extreme] recklessness, and [] even highlighted Agent Olson's testimony in support," Op. Br. at 25–28—support a finding that Maryboy's substantial rights were affected. The second-degree murder conviction depended on Maryboy's having acted with malice aforethought, so the degree of recklessness—the precise subject of the impermissible testimony—was integral to Maryboy's conviction.[9] Given that malice aforethought was the only disputed element at trial, the

---

[9] We temporarily assume the jury disagreed with the government's intentional-shooting theory.

government's error may have led the jury to convict Maryboy of second-degree murder instead of involuntary manslaughter. Such an error plainly affects Maryboy's substantial rights.

The government argues that the statements about recklessness "were a sliver of Agent Olson's testimony, which in turn was a sliver of the 7-day trial bursting with 19 witnesses—3 sentences out of the thousands of pages of trial transcript, which were never mentioned again." Resp. Br. at 27. But, as already explained, Agent Olson's statements about recklessness were not fleeting; the government attempted several times to elicit Agent Olson's opinion on *the degree of* recklessness as an alternative way to prove malice aforethought. And the government relied on Agent Olson's testimony about recklessness in ending its (initial) closing argument:

> I'm going to end on extreme reckless. . . . [E]ven if you accept [Maryboy's version about a misfired warning shot] as told from the stand yesterday, there is no question that he acted extremely reckless. . . . Do you remember the testimony of Jim Olson? We talked about that. I talked about that with him. Remember that? He talked about all of those cardinal rules of gun safety that were being broken by that -- by that act. Finger on trigger, . . . gun not pointed in a safe direction. . . . [I]f you somehow conclude that that's what he did, that as that gun was coming up [for a warning shot] it was pointed directly in Mr. Montowine's direction, [then] that was about as reckless as it gets. And when you go back there and you deliberate and you're thinking about whether that was reckless, ask yourselves: What could be more reckless than that, other than doing what he did, pointing it at his head and firing it?

R. vol. IV, at 1793–94. "[W]hen the prosecution uses closing argument to emphasize the disputed evidence, that emphasis could suggest an impact on the

25

outcome." *United States v. Griffith*, 65 F.4th 1216, 1220 (10th Cir. 2023); *see also United States v. Starks*, 34 F.4th 1142, 1172 (10th Cir. 2022) (finding prejudice where the expert testimony "fortified the proof regarding the main issue [at trial]" and the government "emphasized the importance of [the] testimony [in closing arguments]" (internal quotation marks omitted)).

The government offers two other reasons why this asserted error would not have prejudiced Maryboy. The first is based on the government's earlier waiver argument that we have already rejected. *See* Resp. Br. at 27 (arguing that any error could not have been prejudicial "[b]ecause recklessness was not in dispute"). And the second is that "overwhelming evidence proved that Maryboy *intentionally* shot Montowine," so "[Agent] Olson's statements were unlikely to have substantially influenced the outcome [of the trial]." *Id.* at 27–28 (emphasis added).

The government did not present overwhelming evidence of an intentional shooting. Though the government argued to the jury that Maryboy intentionally shot Montowine, it also argued that the jury could convict Maryboy of second-degree murder based on Maryboy's misfired-warning-shot defense. And given that even Ms. Green's testimony is consistent with Maryboy firing at least one warning shot, we fail to see how the evidence of an intentional shooting was overwhelming. We agree with Maryboy that the government's "intent" argument seems to be based "almost exclusively on the fact that the evidence showed Mr. Montowine was shot in the back, right side of the head and died

26

near the van." Reply Br. at 14. But as mentioned above, Montowine dying near the van is compatible with Maryboy misfiring a warning shot: perhaps Maryboy was simply mistaken about where Montowine was standing as he fired a second warning shot, or maybe Montowine was standing across the truck bed and Montowine's own momentum carried him to the van after he was shot. *See* R. vol. IV, at 536 ("Q. . . . If a person is shot and they are -- as Mr. Montowine was, and they are actually in movement, it may appear that they are still moving even though they are dead or dying, correct?" "A. I guess that's possible. . . . [I]f Mr. Montowine were moving when this occurred, I would just expect just some momentum."). Whatever the explanation, Montowine dying near the van does not rule out Maryboy's defense theory, and it certainly does not rise to the level of overwhelming evidence. With the general verdict form, we cannot say whether the jury found malice aforethought and thus second-degree murder (1) because it thought that Maryboy intentionally shot Montowine or (2) because Maryboy was extremely reckless in firing a warning shot.

Because Rule 704(b) bars Agent Olson's testimony opining on extreme recklessness, *see Wood*, 207 F.3d at 1236, and because the testimony might well have produced a verdict of second-degree murder and not involuntary manslaughter, we see a reasonable probability that, but for the impermissible testimony, the jury would have convicted Maryboy of the lesser-included

27

offense instead of second-degree murder. So Maryboy satisfies the third prong of plain-error review.

#### 4.    Fairness and Integrity of the Judicial Proceedings

Finally, we consider whether the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *B.N.M.*, 107 F.4th at 1170 (internal quotation marks omitted). Allowing Maryboy's second-degree murder conviction to stand would defeat the purpose of Rule 704(b). Without a second-degree murder conviction, the 18 U.S.C. § 924(c) charge would fail too, so Maryboy would not receive the mandatory 10-year consecutive sentence. And the difference in the sentencing guideline ranges for second-degree murder and involuntary manslaughter is significant; the former sentence is 235–293 months' imprisonment and the latter is only 27–33 months' imprisonment. U.S.S.G. §§ 2A1.2(a), 2A1.4(a)(2)(A); *id.* ch. 5, pt. A (Sentencing Table). Such an impact on sentencing affects the fairness of the judicial proceedings. So Maryboy satisfies all four prongs of plain-error review, warranting reversal and a new trial.

### II.    Faulty Jury Instructions

When a defendant sufficiently raises a mitigating defense, like killing in the heat-of-passion or in imperfect self-defense, "the prosecution must 'prove beyond a reasonable doubt the *absence* of [that defense]' . . . . [Otherwise,] the Government [is exempted] from its obligation under the Due Process Clause to prove the defendant guilty of murder beyond a reasonable doubt." *United States*

*v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985) (quoting *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975)). Maryboy argues that the district court plainly erred by failing to instruct the jury that the government had the burden to prove beyond a reasonable doubt that he did not act in imperfect self-defense. We agree.

**A.    The Second-Degree Murder and Self-Defense Instructions**

Before the start of the initial trial in May 2022 (later declared a mistrial for Covid complications), Maryboy and the government jointly proposed jury instructions to the court. Among the proposed instructions was an "imperfect self-defense" instruction that stated, in part, "before you may convict the defendant of second degree murder, you must find beyond a reasonable doubt that the defendant did not act in imperfect self-defense."[10] R. vol. I, at 192. Before the first trial, the district court revised the proposed instructions while trying to better align them with the Tenth Circuit Pattern Instructions and to provide "less complex and numerous" statements of the law. R. vol. II, at 259. But lost in the court's revisions was the parties' proposed instruction that the government had to prove beyond a reasonable doubt that Maryboy had not

---

[10] As stated, perfect self-defense requires that the defendant's level of force be objectively reasonable, but imperfect self-defense allows for unreasonable (excessive) force. *Britt*, 79 F.4th at 1286–87. Both require a subjective belief that force is immediately necessary to prevent death or great bodily harm, but only perfect self-defense requires objective reasonableness. *Id.*

acted in imperfect self-defense. Instead, the district court included only some of the imperfect self-defense instruction as part of the *involuntary manslaughter* instruction.[11] Neither party objected to the revised instructions.

Though the second-degree murder jury instruction did not mention imperfect self-defense, it did require the government to disprove perfect self-defense:

INSTRUCTION NO. 37

. . . To find the defendant guilty of [second-degree murder], you must be convinced that the prosecution has proved each of the following beyond a reasonable doubt:

*First*: the defendant caused the death of Antonio Montowine;

*Second*: the defendant killed Antonio Montowine with malice aforethought;

*Third*: the defendant is an Indian; and

*Fourth*: the killing took place within Indian Country.

*Fifth*: the defendant did not act in self-defense, or it was not reasonable for the defendant to think that the force he used was necessary to defend himself against an imminent threat. . . .[12]

---

[11] Because it makes little sense to include an imperfect self-defense instruction as part of the involuntary manslaughter instruction, we assume this was a scrivener's error. As a mitigating defense, the imperfect self-defense instruction should be tied to the murder instruction. *See* Tenth Circuit Criminal Pattern Jury Instructions Nos. 1.28.1 & cmt, 2.53 note.

[12] The parties agree that this instruction refers only to perfect self-defense, not imperfect self-defense. If the government proved beyond a reasonable doubt only that the self-defense "was not reasonable," then it would have disproved perfect self-defense (which requires objective reasonableness) but not imperfect self-defense (which allows the defendant to have acted unreasonably).

. . . To kill "with malice aforethought" means to kill another person deliberately and intentionally, or with intent to do serious bodily harm, or to act with callous and wanton disregard for human life. Malice aforethought may be established by evidence of conduct that is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that it can be reasonably inferred that the defendant was aware of a serious risk of death or serious bodily harm.

[To further clarify, Second Degree Murder involves reckless and wanton disregard for human life that is extreme in nature, while Involuntary Manslaughter involves reckless and wanton disregard that is not extreme in nature.]

*Id.* at 219, 223–24 (Instruction No. 40). The court also gave a separate perfect self-defense instruction that further defined self-defense and again stated that the government must disprove perfect self-defense to convict Maryboy of second-degree murder:

INSTRUCTION NO. 38

The defendant has offered evidence that he was acting in self-defense.

A person is entitled to defend himself against the immediate use of unlawful force. But the right to use force in such a defense is limited to using only as much force as reasonably appears to be necessary under the circumstances.

A person may use force which is intended or likely to cause death or great bodily harm only if he reasonably believes that force is necessary to prevent death or great bodily harm to himself. . . .

To find the defendant guilty of Second Degree Murder, you must be convinced that the prosecution has proved beyond a reasonable doubt:

*Either*, the defendant did not act in self-defense,

*Or*, it was not reasonable for the defendant to think that the force he used was necessary to defend himself against an immediate threat.

31

*Id.* at 221. Because the instruction requires the force to be reasonable, it refers only to perfect self-defense.

After instructing on the elements of second-degree murder and perfect self-defense, the court instructed the jury on the lesser-included offense of involuntary manslaughter. *See id.* at 222–24 (Instruction Nos. 39 & 40). Though it did not provide a separate instruction on imperfect self-defense, the court included in the involuntary manslaughter instruction a description of imperfect self-defense as an example of conduct that would satisfy involuntary manslaughter's elements:

INSTRUCTION NO. 40

. . . This law makes it a crime to unlawfully kill a human being without malice while committing a lawful act in an unlawful manner, or without due caution and circumspection, which act might produce death. . . .

A person may commit Involuntary Manslaughter if he acts in self-defense, but it was not reasonable for him to think that the force used was necessary to defend himself against an immediate threat. Therefore, the first element is met if the defendant was defending himself, a lawful act, but did so in an unlawful manner by using excessive force that resulted in Antonio Montowine's death.

*Id.* at 223–24. The jury was instructed to reach involuntary manslaughter only if it "unanimously [found] the defendant not guilty of Second Degree Murder, or if, after all reasonable efforts, [the jury was] unable to agree on a verdict as to Second Degree Murder." *Id.* at 222 (Instruction No. 39).

**B.**    **Plain-Error Review**

   **1.**    **Error**

"[A] defendant in a federal murder case who has sufficiently raised a [mitigating] defense is entitled to instructions informing the jury of the theory of defense and of the Government's duty to prove beyond a reasonable doubt the absence of [the mitigating circumstance] in order to obtain a murder conviction." *Lofton*, 776 F.2d at 920.

The government argues that because affirmative defenses, like imperfect self-defense, are conditional on the evidence at trial, and because Maryboy did not request the instruction at trial, Maryboy was not entitled to a sua sponte instruction. But that ignores Maryboy's request for the instruction before trial when the parties jointly proposed their instructions, R. vol. I, at 192, and that the district court (1) instructed on perfect self-defense and (2) included imperfect self-defense in the involuntary manslaughter instruction, R. vol. II, at 221, 223–24. By including the perfect self-defense instruction and referencing imperfect self-defense in a different instruction, the district court plainly thought the evidence at trial supported a self-defense instruction.[13] So

---

[13] The government apparently disagrees with the district court's finding. According to the government, Maryboy "failed to offer any evidence that he subjectively believed deadly force was necessary to prevent serious bodily injury." Resp. Br. at 41. And it asserts that because Maryboy described feeling "a little safer" after grabbing his gun, Maryboy must not have feared for his life when he shot Montowine. *Id.* at 44. But Maryboy repeatedly testified that he was scared for his life and worried that he wouldn't return to his loved ones,

*(footnote continued)*

the asserted error is not that the district court failed to sua sponte provide an

instruction, it's that the provided instruction failed to instruct the jury that the

government had to disprove the defense beyond a reasonable doubt to convict

Maryboy of second-degree murder—an instruction that Maryboy was entitled

to. *See Lofton*, 776 F.2d at 920. Because the district court failed to so instruct

the jury, the government was not held to its burden under the Due Process

Clause. *See id*. So Maryboy satisfies the first prong of plain-error review.[14]

---

R. vol. IV, at 1624, and that Montowine had refused his repeated demands for
Montowine to show Maryboy his hands, *id.* at 1621–23, 1627, 1629–30. He
testified about his fear several times: "I was scared as hell that I am going to
die today," *id.* at 1624; "I'm scared I might die. I might not go home," *id.*
at 1627; "I'm probably not going to leave here," *id.* at 1634. And Maryboy
stated that his fear *increased* when Montowine didn't react to the first warning
shot. *Id.* at 1630.

     Even still, the government argues, because all Maryboy presented were
"his own self-serving statements which were contradicted by [other evidence],"
an imperfect self-defense instruction was improper. Resp. Br. at 41–42 (quoting
*United States v. Woody*, 55 F.3d 1257, 1271 (7th Cir. 1995)). But we apply a
different standard than the Seventh Circuit. "[W]hen deciding whether the
evidence supports a particular jury instruction, a court 'must give full credence
to [the] defendant's testimony.'" *United States v. Toledo*, 739 F.3d 562, 567
(10th Cir. 2014) (quoting *United States v. Benally*, 146 F.3d 1232, 1236 n.4
(10th Cir. 1998)). "Ultimately, the jury may or may not believe the testimony;
but it must be both credited and considered as evidence bearing on the issue of
self-defense." *Id.*

     [14] We pause here to address the government's argument about the
incompatibility of an accidental shooting and acting in self-defense. *See* Resp.
Br. at 42 (citing cases from the Eighth Circuit, a California intermediate
appellate court, and the Georgia Supreme Court). But our precedent explicitly
permits both instructions. In *United States v. Begay*, we rejected the
defendant's argument "that an involuntary manslaughter instruction is
inconsistent with a defense of self-defense and, therefore, should not have been
given to the jury." 833 F.2d 900, 900–01 (10th Cir. 1987). "Whether self-

(<em>footnote continued</em>)

2.    **Plain**

Next, we consider whether the error was plain. We agree with Maryboy that *Lofton* is dispositive here.

In *Lofton*, we held that the district court's failure to instruct the jury on the government's burden to disprove Lofton's heat-of-passion defense was a plain error that warranted reversal. 776 F.2d at 921–22. The only difference between our analysis in *Lofton* and our analysis here is that we address imperfect self-defense instead of heat-of-passion. Both Maryboy's and Lofton's instructions referred to the mitigating defenses "only in the manslaughter instruction," and so "did not advise the jury that [it] was [a] defense to murder." *Id.* at 921. "[T]he very structure of the charge precluded the jury from considering the effect of [the] defense on the murder count" because "the jury was instructed to consider manslaughter only if it found [the defendant] not guilty of murder." *Id.* at 922. And "[t]he verdict form followed this same

---

defense and involuntary manslaughter are inconsistent depends upon the circumstances of the alleged offense as demonstrated by the evidence presented at trial." *Id.* at 901. In finding the two instructions consistent, we explained,

> [T]he jury could have concluded that Begay did not intend to stab Nakai and that his testimony . . . put in issue whether he might have been guilty of gross negligence in so brandishing the knife, and whether this negligence could be sufficient to convict him under that portion of [involuntary manslaughter] which refers to a killing in the commission . . . of a lawful act which might produce death.

*Id.* at 903 (cleaned up). So too could Maryboy's jury have concluded that Maryboy did not intend to shoot Montowine but Maryboy "commit[ed] a lawful act in an unlawful manner, or without due caution and circumspection, which act might produce death." R. vol. II, at 223.

format." *Id.*; *see* R. vol. II, at 239 (instructing the jury not to answer the involuntary manslaughter question if it found that Maryboy was guilty of second-degree murder). So the instructions were "insufficient to inform the jury that the Government must prove the absence of [the affirmative defense] beyond a reasonable doubt." *Lofton*, 776 F.2d at 922.

Maryboy satisfies the second prong of plain-error review.

### 3.    Substantial Rights

Having established plain error, we now consider whether there is a reasonable probability that the jury would not have convicted Maryboy of second-degree murder if it were properly instructed on the government's burden to disprove Maryboy's defense. *See Hasan*, 526 F.3d at 665.

The government argues there is "very little likelihood that any jury would have convicted on involuntary manslaughter" given the forensic evidence that Maryboy shot Montowine in the back of the head. Resp. Br. at 47 (quoting *Sago*, 74 F.4th at 1162). It compares this case to *Sago*, in which the defendant argued that he acted in imperfect self-defense when he "first shot [the victim] from his car" and then pulled the car forward and fired three more shots into the victim's back as the victim ran away. 74 F.4th at 1162. We affirmed his first-degree murder conviction because, even assuming plain error, the trial record did not support that the error affected Sago's substantial rights. *Id.* at 1162–63. The government asserts that we should affirm Maryboy's

conviction for the same reason because "[t]hose same facts apply here."

Resp. Br. at 47.

But the same facts do not apply here, and *Sago* is not instructive. First, though we found that the facts in *Sago* made it unlikely that a jury could find Sago guilty of involuntary manslaughter, Sago's "pull[ing] forward in his car" to fire multiple *intentional* shots to his victim's back *as the victim ran away*, 74 F.4th at 1162, is different from Maryboy's (allegedly) accidentally misfired warning shot to the back of Montowine's head. Sago's conduct was inconsistent with any type of self-defense. Not so for Maryboy's. And no evidence suggested that the victim was about to use deadly force against Sago, *id.*, whereas Maryboy testified about Montowine's crazy look in his eyes, expletives directed at Maryboy, and repeated refusal to show his hands.[15] Second, because Sago's jury convicted him of *premeditated* first-degree murder, we found that it was even less likely that the jury would have convicted Sago of only involuntary manslaughter. *Id.* at 1162–63. "[A] rational jury that believed [the defendant] had formed a plan to kill . . . with reflection and consideration amounting to deliberation, could not also have believed" a

---

[15] Sago testified that he was frightened and believed his victim might be armed, but it is unclear why Sago allegedly believed that. 74 F.4th at 1155. Sago's victim came out of his house at Sago's request, and the victim (including his hands) was in full view of Sago as Sago waited in his car. *Id.* All Sago's victim had allegedly done was angrily walk out of his house, throw his cell phone down on the porch, and "advance[e] towards Mr. Sago's vehicle." *Id.*

mitigating defense. *Id.* at 1163 (quoting *United States v. Frady*, 456 U.S. 152, 174 (1982)). So a jury was not likely to conclude that Sago actually killed only out of fear for his life. *Id.* at 1162–63. The same is not true for Maryboy. As we explained above, the government's evidence of an intentional shooting was not overwhelming. And with the general verdict form, we can't tell whether the jury determined Maryboy intended to kill Montowine or instead acted with extreme recklessness and wanton disregard for human life. So a properly instructed jury may well have found Maryboy guilty of involuntary manslaughter instead of second-degree murder.

In *United States v. Corrigan*, we reversed a jury's verdict because of the possibility that "the jury could have inferred that the burden of proof on the issue of self-defense was on the defendant or that it required something less than proof beyond a reasonable doubt." 548 F.2d 879, 883–84 (10th Cir. 1977). That risk was "too great to allow the conviction to stand." *Id.*; *see also Lofton*, 776 F.2d at 922 (finding that the error affected Lofton's substantial and fundamental rights). The possibility of an improper conviction is perhaps greater for Maryboy because the concern isn't just that the jury may have inferred the wrong burden of proof, but also that it may not have considered Maryboy's defense at all. That the jury instructions allowed the jury to convict Maryboy of second-degree murder *even if* it found that Maryboy acted in imperfect self-defense undermines the jury's verdict. So Maryboy's substantial rights were violated.

38

### 4.    Fairness and Integrity of the Judicial Proceedings

"[W]here a constitutional error has affected the defendant's substantial rights, thus satisfying the third prong of the plain error test, 'it is ordinarily natural to conclude that the fourth prong is also satisfied and reversal is necessary[.]'" *United States v. Miller*, 891 F.3d 1220, 1237 (10th Cir. 2018) (quoting *United States v. Gonzalez-Huerta*, 403 F.3d 727, 745 (10th Cir. 2005) (en banc)). "Not to reverse to correct the error is to ignore the injury the defendant suffered from the violation of his or her constitutional rights." *Id.* (internal quotation marks omitted). Here, the trial violated Maryboy's rights under the Due Process Clause by not requiring the government to prove each element of second-degree murder beyond a reasonable doubt. *See Lofton*, 776 F.2d at 920. This, combined with the significant effect on sentencing discussed above, seriously affects the fairness and integrity of Maryboy's trial. So we reverse.

## III.    Cumulative Error

Even if the errors did not independently affect Maryboy's substantial rights, we would still reverse under cumulative error. This case is challenging because the errors prejudice Maryboy under only one theory of malice aforethought. If the jury found that Maryboy intentionally shot Montowine, then neither error would have affected Maryboy's substantial rights. But if the jury found that Maryboy was trying to fire a warning shot, then both the Rule 704(b) error and the jury instruction error could have led the jury to

convict Maryboy of second-degree murder instead of involuntary manslaughter. If the evidence at trial overwhelmingly favored an intentional and deliberate killing, perhaps we would not reverse. But both these plain errors went to the sole disputed element at trial—malice aforethought. So we have no difficulty concluding that the errors substantially affected Maryboy's rights.

## CONCLUSION

There is a fine line between second-degree murder and involuntary manslaughter. The plain errors of allowing Agent Olson to opine on Maryboy's mental state and failing to instruct the jury that the government had to disprove imperfect self-defense beyond a reasonable doubt may have led the jury to convict on the former instead of the latter. We reverse Maryboy's conviction and remand for a new trial.

23-4117, *United States v. Maryboy*

**HARTZ**, J. dissenting in part

I concur in the judgment and join Part II of the opinion, which holds that the conviction must be reversed for failure to instruct properly on second-degree murder. I respectfully dissent, however, from the discussion in Part I. That discussion holds that a portion of Agent Olson's expert testimony violated Fed. R. Evid. 704(b), which prohibits expert opinion "about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Although the jury could infer Maryboy's mental state from the expert's opinion, he did not opine on that mental state. Juries can, and do, infer an actor's mental state from the actor's conduct. Recall the familiar adage that a person is presumed to intend the natural consequences of his or her acts. But testimony, even expert testimony, about a defendant's conduct does not therefore constitute testimony about the defendant's mental state.

To properly analyze the evidentiary issue before us, we must first understand the relevant substantive law—namely, what constitutes recklessness in the criminal law. There are two components to recklessness. First, there is an objective component. The defendant's *conduct* must be reckless; it must create an unjustifiably high risk of harm. Second, there is a subjective component. The defendant must *consciously* disregard this risk. The first component is ordinarily all that must be proved for civil liability. The second is largely confined to criminal liability, although sometimes it is required in civil cases.

The Supreme Court has clearly stated this distinction between civil and criminal recklessness. "While the term recklessness is not self-defining, the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007) (internal quotation marks omitted). A footnote to the sentence states: "Unlike civil recklessness, criminal recklessness also requires subjective knowledge on the part of the offender. *[Farmer v]. Brennan*, 511 U.S. [825,] 836–837 [(1994)]; ALI, Model Penal Code (MPC) § 2.02(2)(c) (1985)." *Id.* n.18.

The provision of the MPC cited by the Supreme Court defines *recklessly* in the criminal context:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

MPC § 2.02(2)(c). Thus, there must be "a substantial and unjustifiable risk that . . . will result from [the defendant's] conduct" and the defendant must "consciously disregard[]" that risk. *Id.* A leading treatise notes that not every jurisdiction treats recklessness that way, but says the MPC defines *recklessness* to include two requirements: "(a) conduct creating a higher degree of risk than is necessary for ordinary negligence and (b) a subjective awareness that the conduct creates such a risk." Wayne R. LaFave, 1 *Subst.*

2

*Crim. L.* § 5.4 & n.6 (3d ed. 2018). The Supreme Court endorsed that approach in *Safeco*, 551 U.S. at 68 & n.18.

Some confusion may arise from the language of the recklessness instruction given to the jury in this case,[1] which states the objective and subjective elements but also tells the jury that it can infer the subjective element from the objective element. The instruction reads:

> Malice aforethought may be established by evidence of conduct that is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that it can be reasonably inferred that the defendant was aware of a serious risk of death or serious bodily harm.

R., Vol. II at 219. The instruction's focus is on how the jury can infer the defendant's state of mind—awareness "of a serious risk of death or serious bodily harm." Perhaps framing the instruction in that way is the best way to inform the jury. But it may obscure the distinction between the two elements. In any event, the instruction is in keeping with our recent statement that a jury can find the intent for second-degree murder "if the defendant's conduct was so reckless and wanton that the jury is warranted in inferring that the defendant was aware of a serious risk of death or serious bodily harm." *United States v. Kepler*, 74 F.4th 1292, 1300 (10th Cir. 2023) (brackets and internal quotation marks omitted). And implicit in the instruction is the requirement that the jury must first find "conduct that is reckless and wanton, and a gross deviation from a reasonable standard of care." Indeed, if we were to construe the instruction as not requiring the

---

[1] The language of the instruction does not appear in this circuit's pattern jury instruction on second-degree murder, but is taken from commentary to that pattern instruction. *See* Tenth Circuit Criminal Pattern Jury Instruction No. 2.53 cmt. (2023).

objective component of recklessness, we would be clearly violating the law handed down by our Supreme Court.

Once we recognize that the recklessness element of second-degree murder has both an objective and a subjective component, we can more clearly characterize the expert testimony of Agent Olson. After describing his extensive training and experience with respect to firearms, he testified to four "basic rules of gun safety": (1) "keep your finger off the trigger until you're ready to destroy whatever that weapon is pointed at"; (2) "treat every weapon as if it is loaded"; (3) "always keep your muzzle pointed in a safe direction"; and (4) "be aware of your target, that's what you're shooting, and what is beyond." R., Vol. IV at 1487–88. Then most of his testimony on direct examination explained how the weapon used by Maryboy functioned (such as the difference between single-action and double-action firearms) and discussed his testing of the gun. This was followed by the prosecutor's presenting him with three hypotheticals, all of which were based on the assumed positions of the parties. Olson testified that the first two hypotheticals were inconsistent with his test-firing of the weapon. Regarding the third, he said that the course of action would have violated all four safety rules. In particular, he said that it would be "grossly negligent reckless to point a loaded weapon at another person." *Id.* at 1505. On redirect the prosecutor presented Olson with a "scenario" in which the shooter is attempting to fire a warning shot above a target but pulls the trigger prematurely as he is raising the weapon. *Id.* at 1537. Olson said that the action would violate all four safety rules. With respect to the fourth rule (be aware of your target and what is beyond it), he testified that "[i]f this is my target and what is beyond that beyond,

4

that is reckless." *Id.* at 1540. Concluding the direct testimony, the prosecutor asked: "You just used the term reckless. That scenario that we just went through, how reckless is *that act*?" *Id.* (emphasis added). Olson answered: "Any time that you handle a weapon in an unsafe manner it could take another human life. And so to me that's the ultimate expression of recklessness." *Id.* at 1541. On recross-examination, Olson answered "No," to the question, "Is it reckless to want to protect yourself from another individual who you believe has the manner and possibly the means to kill you?" *Id.* at 1542.

It is readily apparent that Olson did not testify to what was in Maryboy's mind. His answers were based on hypotheticals presented by the prosecutor, not on his assessment of what happened. In particular, he did not opine that Maryboy was conscious of how risky his conduct was. To be sure, the jury could infer Maryboy's state of mind from his conduct. But so long as the expert did not testify to the inference about Maryboy's "mental state or condition," there was no violation of Rule 704.

Last year's Supreme Court opinion in *Diaz v. United States*, 602 U.S. 526 (2024), confirms this conclusion. In that case the expert testified to the state of mind of most people in the defendant's circumstances, but because he did not take a further small step and express an opinion on the defendant's state of mind, the Court said there was no violation of Rule 704: "An expert's conclusion that 'most people' in a group have a particular mental state is not an opinion about 'the defendant' and thus does not violate Rule 704(b)." *Id.* at 538. Here, Agent Olson did not even say that most people engaged in the conduct that Maryboy engaged in would be conscious of the great risk. That inference of state of mind was left to the jury.

5

True, this is a narrow construction of the rule. But the narrow construction was what the Court certainly intended. It noted that "[w]hen Rule 704 was originally adopted in 1975, it had no exceptions: All ultimate-issue opinions were permitted." *Id.* at 533. The exception that now appears in Rule 704(b), stating that an expert witness in a criminal case "must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense," was added by Congress after the man who shot President Reagan was found not guilty by reason of insanity at a trial where expert witnesses on both sides testified to their opinions on the ultimate issue of the perpetrator's sanity. *See id.* at 533–34 (internal quotation marks omitted). The exception was not the product of the usual rules-committee process of vetting by judges, scholars, and practitioners. The Court's discussion of the exception's origin suggests its view that in light of the circumstances of its enactment, the exception is best interpreted as closely limited to the specific type of expert testimony that motivated the enactment.

I agree with the majority opinion's summary of the applicable law: "The critical question is whether the opinion allows the factfinder to make an additional inference as to whether the defendant had the mental state or condition constituting an element of the crime charged." Maj. Op. at 21 (internal quotation marks omitted).[2] Once we understand

---

[2] For example, in *United States v. Wood*, we said: "By his testimony that Dr. Wood's actions caused Dykes's death, Dykes's death was a homicide, and a homicide involves the intentional taking of a person's life, Dr. Baden expressly inferred that Dr. Wood acted with specific intent to kill Dykes." 207 F.3d, 1222, 1236 (10th Cir. 2000). The majority opinion suggests that our decision in *Wood* compels its conclusion that the expert testimony that Maryboy was reckless violated Rule 704. *See* Maj. Op. at 18–19

6

that there are two components (two elements) to criminal recklessness, we can see why the applicable law does not require the exclusion of Agent Olson's testimony. All his expert opinion did is provide proof of the first element, the objective component of criminal recklessness.He told the jury that Maryboy's *conduct* was reckless. He said nothing about whether Maryboy was aware of the recklessness of his conduct. This testimony does not require the factfinder to infer the second element, the subjective "conscious disregard" element. To say otherwise is to equate criminal recklessness with civil recklessness.Because I believe that the testimony of Agent Olson did not violate Rule 704(b), I respectfully dissent from the contrary view expressed by the majority opinion.

---

n.5. I disagree. First, *Wood* is probably distinguishable on the ground that the expert who testified to recklessness had, as just mentioned, testified to the defendant's state of mind by saying that the defendant intended to kill the victim. In that context, one might assume that the expert was also testifying to the defendant's state of mind regarding recklessness. Second, to the extent that *Wood* holds that testimony regarding the objective component of recklessness violates Rule 704 because it "necessarily dictates" the conclusion that the subjective component (the defendant's state of mind) was satisfied, 207 F.3d at 1236, that holding is incompatible with the Supreme Court's holding in *Diaz* and is no longer a proper interpretation of the rule. *See, e.g.*, 602 U.S. at 535 (rejecting argument that expert's testimony violated Rule 704 in that he "functionally stated an opinion about whether Diaz knowingly transported drugs when he opined that couriers generally transport drugs knowingly" (brackets and internal quotation marks omitted)); *id.* at 537 (explaining that Rule 704 "as a whole makes clear that an opinion is 'about' the ultimate issue of the defendant's mental state only if it includes a conclusion *on that precise topic*, not merely if it concerns or refers to that topic" (emphasis added)).